815 So.2d 39 (2002)
Richard A. BERLIER
v.
A.P. GREEN INDUSTRIES, INC., et al.
No. 2001-C-1530.
Supreme Court of Louisiana.
April 3, 2002.
Rehearing Denied May 24, 2002.
*41 Arthur W. Stout, III, William C. Harrison, Jr., Deutsch, Kerrigan & Stiles, New Orleans; William F. Sheehan, Michele Svonkin, Shea & Gardner, Washington, DC, Counsel for Applicant.
Frank J. Swarr, Robert E. Arceneaux, Mickey P. Landry, Landry & Swarr, New Orleans; John T. Suttles, Jr., Schafer & Schafer, New Orleans; Thomas H. Huval, Jeansonne & Remondet, New Orleans; David J. Woll, Andrew T. Frankel, Simpson, Thacher & Bartlett, New York City; Aaron G. York, Gibson, Dunn & Crutcher, Counsel for Respondent.
JOHNSON, Justice.[*]
We granted a writ in this case involving a settlement of an asbestos-related personal injury and wrongful death claim to determine whether the four settling defendants are solidarily liable. After reviewing the record and the applicable law, we find that the settlement constitutes a joint and indivisible obligation, and each of the defendants are bound for the full $450,000.00.

FACTS AND PROCEDURAL HISTORY
On November 12, 1998, Richard Berlier filed a petition for damages for personal injuries resulting from occupational exposure to asbestos products. After his death on January 30, 1999, his surviving spouse and five adult children amended the petition to assert a wrongful death and survival action, as well as loss of consortium claims.
On December 13, 1999, the day the case was set for trial, the plaintiffs agreed to settle their claims against four of the defendants, GAF Corporation ("GAF"),[1] Turner & Newell, PLC ("T & N"), Union Carbide Corporation ("Union Carbide"), and Asbestos Claims Management Corporation ("ACMC"), for a lump sum total of $450,000 to be paid on or before March 13, 2000. At the time of the settlement, all four defendants were members of the Center for Claims Resolution ("CCR"), an organization established in 1988 to handle asbestos claims on behalf of its twenty-one member companies.[2]
The relationship among the various members of the CCR is controlled by the "Provider Agreement Concerning Center for Claims Resolution (the "Provider Agreement")," which was executed on September 28, 1988. The CCR is administered by a Board of Directors, and the Provider Agreement authorizes the CCR "to administer and arrange for the evaluation, settlement, payment, or defense of all asbestos-related claims." By becoming *42 a member the CCR, the member "designates the [CCR] as its sole agent to administer and arrange on its behalf for the evaluation, settlement, payment or defense of all asbestos-related claims against [it]." The Provider Agreement, further provides that liability payments shall be apportioned to each member according to a specific share allocation matrix, that such apportionment shall establish the responsibility of each [member] for a percentage share of liability payments, and that each member shall pay in a timely manner the percentages of liability payments involved. Any disputes between the CCR and the members regarding the allocation or payment of a member's percentage of liability are to be resolved through alternative dispute resolution.
The settlement reached by the parties was announced on the record as follows:
William Harrison for Turner and Newell [T & N plc], GAF Corporation, National Gypsum [which later became ACMC], together with my partner, Janet McDonell for Union Carbide, put on the record on behalf of those four defendants, we have reached a full settlement with all the plaintiffs in this matter, in Berlier versus A.P. Green and that we have discussed this matter with Frank Swarr and Mr. Diaz as well as attorney for Maples and LeBlanc. We understand Your Honor will be signing an order as to the funds and we'll have the check made payable to both law firms, Mr. Diaz, and to LeBlanc, Maples. We'll give it to Mr. Diaz to be deposited and subject to the Court's order. At that point
MR. DIAZ [Attorney for plaintiffs]:
Your Honor, that is correct. I understand what I'm going to do is take the check. I'm going to deal with my opponent here. He's going to see that it gets signed on behalf of Maples and LeBlanc right away, negotiate with the plaintiffs what their costs and attorney's fees are, disburse that to them, subject to his prior approval, and take residue of that in a separate trust account and keep it there until further orders of the Court.
THE COURT:
So talking about the costs, you said attorney fees, costs, and their settlement proceeds, so attorneys fees will be held in trust.
MR. SWARR [Attorney for plaintiffs]:
The intervention will be tried before you as a bench trial.
On the settlement, I don't mind the settlement as long as any and all rights are reserved against any other defendant known or unknown; it will be fine.
MR. HARRISON:
That's acceptable.
(UNIDENTIFIED ATTORNEY):
Just for the record, this will be committed to a separate writing in the form of a receipt and release.
On December 17, 1999, James McFadden of the CCR sent a letter to plaintiffs' counsel confirming the settlement, noting the lump sum amount of the settlement at the top of the letter, and providing as follows:
This letter confirms settlement of the above-referenced matter. It is agreed and understood that this settlement fully releases all members whether or not such members are parties to these lawsuits. Furthermore, it is understood that this settlement includes any and all companion actions in this or any jurisdiction for these plaintiffs.
Payment will be made in accordance with the terms of the settlement, providing a release has been executed properly and returned to the CCR. Please have the enclosed release request form completed and returned to Denise Loughran *43 at the Center. We, in turn, will prepare the release from the information provided on the release form and send it to you for execution by your clients.
The release, executed by the plaintiffs on January 28, 2000, provided in pertinent part as follows:
For and in consideration of the sum of One Dollar ($1.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, we [plaintiffs] ... release and forever discharge: Amchem Products, Inc.; Armstrong World Industries, Inc.; The Asbestos Claims Management Corporation (formerly known as National Gypsum Company) and The NGC Asbestos Disease and Property Damage Settlement Trust; CertainTeed Corporation; C.E. Thurston & Sons, Inc.; Dana Corporation; Ferodo America, Inc.; Gasket Holdings, Inc. (f/k/a Flexitallic, Inc.); GAF Corporation, J.U. North America, Inc.,; Quigley Company, Inc.; Shook & Fletcher Insulation Co.; T & N, plc; Union Carbide Corporation (f/k/a Union Carbide Chemicals & Plastics Company, Inc.); and United States Gypsum Company ... from any and all rights, ... which Releasors now have or may have in the future for personal injuries, disability, pain and suffering or death ... or any other asbestos-related diseases or condition suffered by RICHARD A. BERLIER, SR., ....
* * *
The parties understand and agree that nothing contained in this agreement shall be construed or deemed an admission of wrongdoing or of liability by any party as to any of the claims or counterclaims which have been made in the litigation....
On March 8, 2000, the CCR sent plaintiffs' counsel a check for $250,028.46, along with a letter containing the following:
Pursuant to the CCR's settlement with you, enclosed is a check for $250,028.46. This check represents the total of the amounts due for each of the claims in the attached listing, subject to payment at this time under the terms of the settlement agreement, less the amounts payable for each of these claims by GAF Corporationwhich total $199,971.54. The CCR has billed GAF Corporation for these amounts, but GAF has to date refused to pay such billings.[3]
The plaintiffs refused to cash the check and on March 17, 2000, filed a Motion to Enforce Settlement against all four defendant companies. At the hearing on the motion, GAF was represented by its own counsel. During the course of the hearing, the trial judge inquired about the settlement:
THE COURT:
In the settlement. Each defendant entered into a settlement. When it was being put on the record, at that point, I said unless I have an amount I can't enforce the settlement. And it was agreed between counsel that there would be a written document transferred back and forth which would then make it an enforceable settlement because the amount would be contained in the written document. Did that occur?
MR. SWARR:
Your Honor, yes.
MR. HARRISON:
Your Honor, I believe that there is a letter from the CCR shortly after the *44 December 13 settlement that was placed on the record. It's attached as an exhibit.
It's from a gentleman named Mr. Jim McFadden and sets out the cumulative amount for the four members, one of which is GAF.
MR. DUVAL [Attorney for GAF]:
Your Honor, as follow-up to that, I think you just touched on the heart of the whole matter.
On April 27, 2000, the trial court entered a judgment in favor of plaintiffs, finding that GAF, ACMC, Union Carbide, and T & N are liable, in solido, to plaintiff in the sum of $450,000.00. All four defendants appealed. However, after filing its appeal, GAF filed a voluntary Petition for Bankruptcy Relief under Chapter 11, and the United States Bankruptcy Court for the District of New Jersey issued an automatic stay all proceedings against GAF/G-I. The court of appeal granted the plaintiffs' motion to sever GAF's appeal. Berlier v. A.P. Green Industries, 00-2215 (La.App. 4 Cir. 4/25/01), 787 So.2d 1054, 1058. Thus, GAF is not a party to the appeal.
Additionally, after the appeals were filed, counsel for the remaining three CCR defendants (ACMC, Union Carbide, and T & N) moved to withdraw as counsel for ACMC, alleging that CCR was no longer authorized to act on ACMC's behalf because ACMC's membership in CCR was terminated effective August 19, 2000. Subsequently, counsel pro hac vice for ACMC advised the court that all proceedings against ACMC were enjoined by virtue of a March 1993 "Confirmation Order" of the United States Bankruptcy Court for the Northern District of Texas, which contained an exception that allowed proceedings against ACMC to continue as long as ACMC was a member of the CCR. Thus, when ACMC's membership in CCR was terminated, the order stayed all proceedings against ACMC. In light of this, the court of appeal determined that it was "not prohibited by the injunction prohibiting proceedings against ACMC from deciding the issues raised by the appeal filed by the CCR defendantsnow only T & N and Union Carbide." Id. at 1059.
The appellate court then set out to decide "only the single issue presented by the appeal filed by the CCR defendants whether the trial court properly entered judgment against all four settling defendant companies in solido, rather than entering judgment against GAF/G-I Holdings alone, as the Berliers orally requested at the hearing on the matter." Id. The court of appeal affirmed the trial court's judgment, finding that the four settling defendants were solidarily liable for the settlement as a matter of law, as expressed in Cole v. Celotex Corp., 599 So.2d 1058 (La.1992). Id. at 1060. This court granted the writ application filed by T & N and Union Carbide. Berlier v. A.P. Green Industries, Inc., 01-1530 (La.9/14/01).

DISCUSSION
The sole issue before us is whether the four defendants are solidarily obligated to pay the $450,000.00 lump sum settlement.
The Louisiana Civil Code provides the framework for analyzing the types of obligations involving multiple persons recognized under Louisiana law, which are several, joint, and solidary obligations. LSA-C.C. art. 1786. In this case, the lower courts found that the four defendants are solidarily liable under the terms of the settlement.

Solidary Liability
LSA-C.C. art. 1796 provides:
Solidarity of obligation shall not be presumed. A solidary obligation arises from clear expression of the parties' intent or from the law.
*45 The court of appeal found that a solidary obligation arose in this case from the law, relying on Cole v. Celotex, supra, in which "the Louisiana Supreme Court held that various asbestos defendants are solidarily liable for damages suffered by plaintiffs." 787 So.2d at 1060. However, the court of appeal erred in relying on Cole, a delictual action wherein certain defendants were found liable after a two-week trial for failing to provide a safe workplace, and the liability of the manufacturers of asbestos containing products, who settled before trial, was stipulated at trial. In this case, there was no trial on plaintiffs' tort claim as the parties settled before trial, and, the release expressly states that "nothing contained in this agreement shall be construed or deemed an admission of wrongdoing or of liability by any party...." Except for the settlement, there would be no liability at all, since this case has not been tried. Whether the defendants in this case would have been solidarily liable in tort has not been, and may never be, determined. Therefore, Cole is inapplicable to the instant case.
Thus, as solidary liability does not arise in this case from law, the only remaining issue is whether it arises from a "clear expression of the parties' intent." A solidary obligation may arise even though the words "solidarity" or "in solido" are not used, as long as the parties' intent to be solidarily liable is clearly expressed. La. C.C. art. 1796, Official Comment (b). In resolving this issue in a case involving the joint or solidary liability of six makers of a promissory note, this Court explained:
When several persons join in the same contract to do the same thing, it produces a joint obligation on the part of the obligors. However, where several persons obligate themselves to the obligee by the terms In solido or use any other expressions that clearly show that they intend that each one shall be separately bound to perform the whole of the obligation, it is called an obligation in Solido on the part of the obligors. An obligation In solido is not presumed; it must be expressly stipulated.
It is well settled that, absent additional promissory language, the words `(w)e promise to pay' in a note signed by co-makers are insufficient to constitute the express stipulation of liability In solido required by law.
Johnson v. Jones-Journet, 320 So.2d 533, 536-37 (La.1975). Likewise, albeit in dicta, this Court explained:
The coextensive obligations for the "same thing" create the solidarity of the obligations. When it is not clear that the parties are all obliged to the same thing (as in the case of an agreement by several parties to repay a loan), then an obligation in solido is not presumed and must be expressly stipulated. La. C.C. art.2093 [now La. C.C. art. 1796]. However, when it is entirely clear that the parties are all obliged to the same thing (as when the law requires each of two or more parties to pay tort damages concurrently caused by each party), then there is an obligation in solido by definition, as a matter of law, and there is no need to presume solidarity. The presumption against solidarity is only designed to be of assistance when it is necessary to determine whether an obligation is joint or solidary.
Narcise v. Illinois Cent. Gulf R. Co., 427 So.2d 1192, 1194 (La.1983).
In this case, there is no evidence of a "clear expression" of the defendants' intent to be solidarily bound. As stated above, at the hearing on December 13, 1999, when the settlement was announced, Mr. Harrison stated: "William Harrison for Turner and Newell [T & N plc], GAF Corporation, National Gypsum [later *46 ACMC], together with my partner, Janet McDonell for Union Carbide, put on the record on behalf of those four defendants, we have reached a full settlement with all the plaintiffs in this matter." The plaintiffs argue that Mr. Harrison's statement that "we'll have the check made payable to both law firms" represents the defendants' intent to be bound in solido by issuing only one check. We disagree that the issuance of one check clearly indicates an expression of solidarity. Secondly, the confirmation letter from the CCR on behalf of the four defendants dated December 17, 1999, wherein a lump sum amount of the settlement was written at the top of the letter, does not contain a clear expression of the parties intent to be bound in solido. Instead, it is an agent's agreement that his principals will pay the lump-sum of $450,000 to the plaintiffs conditioned upon the release of all CCR members from this lawsuit. There is no expression, clear or otherwise, that the four defendants will be solidarily bound to pay that amount. Finally, the release executed on January 28, 2000, contains only general release language in favor of all the defendants in the lawsuit, including the four CCR defendants, and can in no way be construed to contain a clear expression that the any of the defendants would be solidarily bound. Therefore, we find that the lower courts erred in holding that the defendants are solidarily liable for the amount of the settlement.

Several Liability
The second category of obligations is that of several liability. An obligation is several for the obligors "when each of different obligors owes a separate performance to one obligee, ..." LSA-C.C. art. 1787. The comments to this article explain that "if the performance owed by each obligor has a different object, the obligation is several, as when one obligor owes delivery of a thing and another owes payment of a sum of money." LSA-C.C. art. 1787, Official Comment (b). For example, if through the same act, two persons each bind themselves to give a different sum of money to another, the obligation is several for the obligors. Litvinoff, Treatise supra § 7.11. Professor Litvinoff also notes that in the typical several obligation, the performance promised by each obligor has a different object, which allows each obligor to be regarded as the passive subject of a different and separate obligation. Id.
In the instant case, rather than separate performances, the agreement indicates that only one performance was contemplated on the part of the defendants, namely one payment of $450,000 in exchange for the plaintiffs' signing a document entitled "RELEASE," which released from liability fifteen different business entities. Also, the obligors together promised to give to the plaintiffs one sum of money, not each a different sum. It follows that the defendants' performance had only one object, the lump sum payment of $450,000, and each defendant cannot be regarded as the passive subject of a different and separate obligation. Therefore, the obligation at issue is not a several obligation.

Joint Liability
The final category is that of joint obligations. In part, a joint obligation is one where different obligors owe together just one performance to one obligee, or where one obligor owes just one performance intended for the common benefit of different obligees. LSA-C.C. art. 1788. Professor Litvinoff states that an obligation would be joint for the obligors if, through the same act, they promise to give just one sum of *47 money to another, such as in the instant case. Litvinoff, Treatise supra § 7.21. In addition, a pre-revision case which the reporter of the revision committee found useful indicated that the classification of an obligation as several or joint depends upon the parties' intentions and understanding, as revealed by the language of their contract and the subject matter to which it refers. See Nabors v. Producers' Oil Co., 140 La. 985, 74 So. 527, 531 (1917); LSA-C.C. art. 1788 cmt. (d). In Nabors, this Court stated:
With regard to the subject-matter, the authorities agree that the contract is entire and not severable, although it embodies a conveyance or delivery of several things, if the consideration is paid in a gross sum and it is impossible to affirm that the party making the payment would have done so unless the rights he acquired should apply to all of the things mentioned.
Nabors, 74 So. at 531. Nabors held that a mineral lease created a joint obligation where several lessors disposed of the mineral rights on several tracts of land for a gross price, without stating the amount paid to each lessor and without stating or designating the area of land belonging to each lessor.
Although Nabors dealt with an obligation that is joint for the obligees (lessors), it is nevertheless instructive on whether an obligation is joint for obligors, such as in the instant case. The defendants owed one performance to the plaintiffs, namely to pay the plaintiffs a lump sum of $450,000.00, and they bound themselves for this performance through the same act, namely the settlement agreement. It would be impossible to affirm that the defendants would have agreed to pay the plaintiffs unless all the defendants were released, or whether the plaintiffs would have released all the defendants unless all the money were paid. Also, similar to Nabors, the plaintiffs released their rights to hold all the defendants, plus others, liable for a gross price, and there was no statement of the amount for which each defendant was responsible. Accordingly, we hold that the four defendant companies, T & N, GAF, ACMC, and Union Carbide, are jointly obligated to the plaintiffs for the full amount of the settlement.
Next, to determine the effect of a joint obligation on the obligors, it is necessary to determine whether the joint obligation is divisible or indivisible, because the revision "leans heavily on the notions of divisible and indivisible obligations." Expose, supra § 5. If the joint obligation is divisible, neither obligor is bound for the whole performance; rather, each joint obligor is bound to perform only his portion. LSA-C.C. art. 1789. On the other hand, if the joint obligation is indivisible, the joint obligors are subject to the rules governing solidary obligors. Id. One of the principal applications of the rules governing solidary obligors to joint and indivisible obligors is that the obligee, at his choice, may demand the whole performance from any of the joint and indivisible obligors. See LSA-C.C. art. 1795. This notion that all parties who contract an indivisible debt may be liable for the whole is not new; it appears in art. 2113 of the 1870 Code, art. 2109 of the 1825 Code, and art. 122 of the 1808 Code.[4] Revised article 1789 reflects a partial change in the law, but one consistent with general principle, and one that provides a practical approach to situations where theoretical foundations could become *48 insurmountable obstacles to fair solutions, such as in the instant case. Litvinoff, Treatise, supra § 7.94.
In Louisiana, divisibility of a joint obligation depends on divisibility of the object of the performance, unlike joint obligations at common law. Litvinoff, Treatise, supra § 7.94; Hincks v. Converse, 38 La. Ann. 871 (1886). This rule is expressed in LSA-C.C. art. 1815:
An obligation is divisible when the object of the performance is susceptible of division.
An obligation is indivisible when the object of the performance, because of its nature or because of the intent of the parties, is not susceptible of division.
(Emphasis added.)
French doctrine has always held that division of an obligation cannot take place when the object of the performance is indivisible. Litvinoff, Treatise, supra § 7.94 (citing 7 Planiol et Ripert, Traite pratique de droit civil francais 413 (Louisiana State Law Institute transl., 2d ed.1954)). Combining the ideas of Charles DuMoulin and Andre d'Alciat, Planiol explains that indivisibility is derived sometimes from the nature of the object due (ex natura), and sometimes from the intention of the parties (ex voluntate). 2 Marcel Planiol & George Ripert, Treatise on the Civil Law, pt. 1 no. 782 (La.St.L.Inst. trans., 11th ed.1939). Planiol also states that indivisibility is contractual, or ex voluntate, when the thing which makes the object of the obligation is in all respects divisible, but the parties intend that the obligation should be executed as if it were indivisible. Id. at No. 787. Authorities are in agreement that money, which is the object of the obligation at issue in the instant case, is "in all respects divisible." See, e.g., Martin v. Louisiana Farm Bureau Cas. Ins. Co., 94-0069, p. 5 (La.7/5/94), 638 So.2d 1067, 1069 (stating that "[t]he obligation to pay money at issue here is susceptible of division and thus provides no basis for legal subrogation"); Planiol, supra (remarking that nothing is more divisible than money); Saul Litvinoff, The Law of Obligations in the Louisiana Jurisprudence 599 (1979) (stating that a sum of money is divisible as a matter of fact).
Although money, by its nature, is divisible, LSA-C.C. art. 1815 provides that an object can also be indivisible because the parties so intended. Thus, even where an object by its nature may be rendered in partes (such as a lump sum settlement for $450,000.00), it must be performed as a whole where it is indivisible because of the parties' intent. Saul Litvinoff, The Law of Obligations in the Louisiana Jurisprudence 599 (1979).
In this case, it is apparent that the parties to the settlement agreement intended that "the obligation should be executed as if it were indivisible." If the parties had intended for the obligation to be divisible, then one would reasonably suspect that they would have determined each defendant's pro-rata portion, and each defendant would be bound for a sum certain. However, the parties never made such a determination, nor did they discuss such a method of payment. Rather, throughout their negotiations, plaintiffs and defendants proceeded as though their mutual obligations were indivisible. At all times, the defendants acted through a single mandatary, the CCR. On the morning of trial, the four defendants, represented by one law firm, announced on the record that, "on behalf of those four defendants, we have reached a settlement with the plaintiffs." The parties contracted for one lump-sum payment of $450,000.00, and the letter sent by the defendants' mandatary confirmed the object as a single sum, *49 $450,000.00. Plaintiffs were never informed as to how the settlement amount would be apportioned among the four defendants, and there was no indication that the amount would be paid other than by the mandatary in full. Pursuant to the agreement, plaintiffs could not release only those defendants who contributed to the settlement, but had to release, unconditionally, all four defendants, plus fifteen other business entities. Therefore, as this obligation is indivisible because of the parties' intent, it must be performed as a whole even though, by its nature, its object may be rendered in parts. Litvinoff, Obligations, supra at 599.
Of course, this is not to say that the obligation in question is indivisible merely because it was incurred in exchange for an indivisible obligation. Aubry & Rau, Cours de Droit Civil Francais, Vol. IV-Sixth Edition, translated in 1 Civil Law Translations § 301 (La.St.L.Inst. 1965) (stating that a divisible obligation does not become indivisible merely because it is correlative to an indivisible obligation from a commutative contract). Rather, it is the sum total of the facts surrounding the defendants' obligation, as discussed above, which reveals that the parties' intent was that their obligation be indivisible.

CONCLUSION
For the reasons stated above, we find that there existed a joint and indivisible obligation which binds each of the defendants for the full $450,000.00.
LOBRANO, J., concurs in the result.
VICTORY, J., dissents and assigns reasons.
TRAYLOR, J., dissents for reasons assigned by VICTORY, J.
VICTORY, J., dissenting.
I dissent from the majority's holding that the settlement in this case constitutes a joint and indivisible obligation, binding each of the defendants for the full $450,000. Initially, however, I must point out that in my view, it is not at all clear that there is a legally enforceable settlement agreement in this case under La. C.C. art. 3071, much less a "settlement agreement wherein the parties contracted for one lump-sum payment of $450,000." Op. at 48.
While I agree with the majority's finding that "there is no evidence of a `clear expression' of the defendants' intent to be solidarily bound" under La. C.C. art. 1796, I find that, for the same reasons that the majority made that finding, there was also no evidence that the defendants intended to be solidary bound for purposes of creating a joint and indivisible obligation under La. C.C. art. 1815. Based on the same evidence, the majority finds "there is no evidence of a `clear expression' of the defendants' intent to be solidarily bound," yet then concludes "it is apparent that the parties to the settlement agreement intended that `the obligation should be executed as if it were indivisible.'" However, the obligation does not meet the requirements for a joint and indivisible obligation under La. C.C. art. 1815 because there is no evidence that it was the intent of the parties to treat the object of the defendants' obligation, the payment of a sum of money, as an indivisible obligation. See Saul Litvinoff, Louisiana Civil Law Treatise: The Law of Obligations, § 9.5 (defining a conventional indivisible obligation as follows: "When an obligation would be divisible because the object of its performance is susceptible of division, the parties to a contract may agree that it shall be performed as if its object were invisible, which makes the indivisibility conventional, rather *50 than natural.") Not only is there no evidence that the defendants intended the payment of the $450,000 to be divisible. The majority opinion discusses at some length the arrangements made between the defendants and the CCR clearly showing the defendants did not intend to be bound for the whole, but only for the percentage assigned in the Provider Agreement. Further, there is no evidence the plaintiffs intended the obligation to be indivisible for the defendants, as this settlement was so loosely structured that no amount was even stated on the record in open court.
The reason the code articles require that both parties intend that a joint obligation be either solidary under La. C.C. art. 1796 or indivisible under La. C.C. art. 1815, is because of the onerous effects on the obligors if the obligation is characterized as either of the above. To allow the intent of just one party, the obligee, which in this case is not even discernable, to impose solidary liability on the obligors is unjust. Further, La. C.C. 1818 clearly states that "[a]n indivisible obligation with more than one obligor or obligee is subject to the rules governing solidary obligations." La. C.C. art. 1796, requiring that a solidary obligation shall not be presumed and "arises from a clear expression of the parties' intent or from the law" is certainly a "rule[ ] governing solidary obligations." By providing a lower standard in the law for what constitutes a joint and indivisible obligation under La. C.C. art. 1815, which under the majority's holding is an "apparent intent," the majority opinion renders meaningless the requirement found in La. C.C. art. 1796, made applicable by virtue of La. C.C. art. 1818, that a clear expression of intent is need to create a solidary obligation, and, creates far too much certainty in the law on which contracting parties have relied in this state for years.
Therefore, I respectfully disagree with the majority's holding that the parties intended this divisible obligation be treated as if it were indivisible under La. C.C. art. 1815, and I am of the firm view that the defendants are not solidarily liable in this case, neither by virtue of La. C.C. art. 1796 nor 1815.
NOTES
[*] Retired Judge Robert L. Lobrano, assigned as Associate Justice Pro Tempore, participating in the decision.
[1] GAF is now known as "G-I Holdings, Inc."
[2] The CCR is not now, and never has been, a defendant in this or any other asbestos personal injury claims, but is simply an agent charged with defending such claims against its members. In its brief, plaintiffs' counsel analogizes the CCR to that "of large corporation's in-house legal counsel, who may hire outside firms ... to actually litigate claims brought against the corporation subject to in-house counsel's direction."
[3] Apparently, GAF has failed to fulfill its settlement obligations in numerous cases throughout the country, that were entered into by the CCR before GAF's membership in the CCR was terminated sometime between December 17, 1999 and April 27, 2000.
[4] The 1808 Code is properly styled "A Digest of the Civil Laws now in Force in the Territory of Orleans, with Alterations and Amendments Adapted to its Present Form of Government."