993 So.2d 187 (2008)
CHEVRON U.S.A., INC.
v.
STATE of Louisiana, et al.
No. 2007-C-2469.
Supreme Court of Louisiana.
September 8, 2008.
Rehearing Denied November 21, 2008.
*188 James D. Caldwell, Attorney General, E. Kay Kirkpatrick, Ryan Michael Seidemann, Assistant Attorneys General; Ottinger Hebert, LLC, Patgrick S. Ottinger, Stuart Michael Simoneaud, Renee Angela Dupre, Valerie V. Guidry, Lafayette; Ballay, Braud & Colon, PLC, Stephen Charles Braud, Belle Chasse, for applicant.
W. Eric Lundin, III, Parish Attorney, LeVerrier Cooley, IV, Special Assistant Parish Attorney; Liskow & Lewis, Joe Barrelle Norman, New Orleans, Collette Nicloe Ross; Robert Emmett Tarcza, New Orleans; Robert L. Lobrano, for respondent
CALOGERO, Chief Justice.[*]
This case commenced with a concursus and declaratory judgment action filed by plaintiff, Chevron USA Inc., which sought to determine which of two defendants, the Plaquemines Parish Government ("PPG") or the State of Louisiana, is entitled to receive mineral royalties being derived from Unit Tract 1 located in Plaquemines Parish, Louisiana. Pursuant to a lease granted by the Buras Levee District ("BLD") in 1938, Chevron maintains oil and gas production on several tracts of land that include both Unit Tract 1 and Tract 87. In a previous action involving entitlement to royalties derived from Tract 87, the court of appeal found that the 1938 lease is valid and that PPG, with which the BLD was merged and consolidated in 1975, is entitled to receive the mineral royalties attributable to Tract 87. Plaquemines Parish Gov't v. State, 01-1027, 01-1028 (La.App. 4 Cir. 4/10/02), 826 So.2d 14, writ denied, 02-1304 (La.9/13/02), 824 So.2d 1170 (hereinafter sometimes referred to as "the Tract 87 litigation"). The court of appeal found in this case that, because the Tract 87 litigation decided that the 1938 lease is valid, the application of res judicata in this case bars the State of Louisiana and the two State agencies aligned with the State, State Mineral Board, and State Department of Natural Resources (hereinafter referred to collectively as "the State"), from asserting ownership of Unit Tract 1 and correspondingly the benefits of the mineral royalties. The court of appeal therefore affirmed a district court judgment granting a motion for summary judgment in favor of Chevron and its aligned defendants, PPG, the Chauvin Family Interests, and Robert L. Lobrano (hereinafter referred to collectively as "PPG").
Applying the law to the facts of this case, we find that the court of appeal erred when it granted the motion for summary judgment on grounds of res judicata. Significantly, we find that the court of appeal incorrectly concluded that the "transaction or occurrence" from which the two cases arise was the 1938 lease. For the reasons detailed below, we find that the two cases *189 involve two different "transactions or occurrences," such that the fifth necessary element for a finding of res judicata is not satisfied. We further find that Chevron and PPG have not otherwise carried their burden of showing that they are entitled to summary judgment. Rather, genuine issues of material fact regarding ownership of portions of Unit Tract 1 remain that prevent the granting of summary judgment because one of the necessary elements for proving entitlement to summary judgment is not present. Further, Chevron and the PPG have not shown that they are entitled to judgment as a matter of law, the other necessary element for proving entitlement to summary judgment.

FACTS AND PROCEDURAL HISTORY
The "General Assembly of the State of Louisiana" originally created the BLD by 1894 La. Act No. 18, which defined the geographic limits of the BLD on the basis of certain landmarks.[1] The General Assembly amended and re-enacted Section 11 of 1894 La. Act. No. 18 when it adopted 1910 La. Act No. 205 to provide that
all lands now belonging or that may hereafter belong to the State of Louisiana, and embraced within the limits of the levee district as herein constituted shall be, and the same are hereby given, granted, bargained, donated, conveyed and delivered unto the Board of Commissioners of the [BLD]. . . .
Following a six-month period after the act became law to allow former landowners to redeem land lost to the State in a prior tax sale, 1910 La. Act No. 205 required that the Auditor and Register of Land Office should
convey to the Board of Levee Commissioners, by proper instruments of conveyance the lands hereby granted or intended to be granted and conveyed to said board, whenever from time to time said Auditor and said Register of the said Land Office, or either of them, shall be requested to do so by the said Board of Levee Commissions or by the president thereof; and thereafter said president of said board shall cause said conveyances to be properly recorded in the recorder's office of the parish of Plaquemines, and when said conveyances are so recorded the title to said land with the possession thereof shall from thenceforth vest absolutely in said Board of Levee Commissioners. . . .
(Emphasis added.)
It was not until 1938 that the 1910 Act's command was addressed when, by 1938 La. Act No. 324, the Louisiana Legislature "redefined" the geographic limits of the BLD,[2] and provided that "all lands not heretofore conveyed to said Levee District shall henceforth be conveyed to it, according to all the terms and provisions of the *190 relative granting statutes." Pursuant to their duty as set forth in 1910 La. Act No. 205, Register of the State Land Office, Lucille May Grace, and State Auditor, L.B. Baynard, Jr., on September 9, 1938, executed a document that did "grant, transfer, convey, deed and set over and deliver" to the BLD Board of Commissioners certain described lands in Plaquemines Parish.[3] The copy of that document attached to PPG's motion for summary judgment in this case indicates that it was recorded in Plaquemines Parish in COB 91 Folio 305 on September 13, 1938. The property conveyed in that instrument included both Tract 87 and Unit Tract 1.
Even before the State officially transferred the property to the BLD on September 18, 1938,[4] that is, on June 11, 1938, the Board of Commissioners of the BLD, as lessor, and Delta Development Co., as lessee, executed a mineral lease agreement for several tracts of land described as follows:
All lands owned by the [BLD] in the three townships included in the act of conveyance from the State of Louisiana to this Board, dated May 11, 1938; reg. in Parish COB 88 fo 26,[5] which act of conveyance is referred to here for certainty as to all of the lands and three townships included in this lease, and on all lands owned by this Board, or in which this Board has any right, title or interest or may acquire in the "Jump" between the upper bank of Red Pass and the lower boundary of the levee District at West Bay, under provisions of Act 18 of 1894 and Act 205 of 1910, as amended.
Both Tract 87 and Unit Tract 1 are included in the above description of the land *191 included in the lease agreement. On February 11, 1939, Delta Development subleased the property to Gulf Refining Co., which later became Chevron, plaintiff herein. Chevron and/or its predecessor has maintained oil and gas production at all times since that date, except for a temporary cessation in 2005 caused by Hurricanes Katrina and Rita.
In 1941, the right of the Board of Commissioners of the BLD to levy and collect taxes, which was specifically granted by 1894 La. Act No. 18, was challenged by several residents and taxpayers in the district. In determining that the BLD had authority to levy taxes, this court considered the character of the BLD in Commander v. Board of Commissioners of Buras Levee District, 202 La. 325, 11 So.2d 605 (1942). The court found that the BLD was a political subdivision of the State "created by the Legislature for the purpose of constructing and maintaining the levees within its territorial jurisdiction for the accomplishment of which it is invested with wide governmental powers." Id. at 332, 11 So.2d at 607. In reaching that conclusion, the court did not "attach any significance to the omission of levee districts from the classification of subdivisions of the State as contained in section 14(a) of Article XIV of the Constitution of 1921." Id. at 334, 11 So.2d at 608.
In 1943, the State sued the BLD seeking to recover "a large area of land in the lower part of the parish of Plaquemines, on the west side of the Mississippi River," claiming that the land in question was improperly transferred to the BLD by the Register of the State Land Office and the State Auditor because it was not within the limits of the levee district. State v. Gulf Refining Co., 202 La. 951, 954, 13 So.2d 277, 277 (1943). The State further contended that, because the transfer was improper, BLD's lease to Delta Development and Delta Development's sublease to Gulf Refining were null and should be cancelled from the parish conveyance records. Id. at 955, 13 So.2d at 278. This court described the land in question as consisting "mainly of submerged areas which the state acquired by virtue of her inherent sovereignty." Id. at 954, 13 So.2d at 277. Contrary to the State's contentions, the court found that the State had no title to any of the land claimed in its petition and that 1938 La. Act. No. 324 was constitutional, such that the 1938 instrument was a valid and constitutional conveyance from the State to the BLD. Id.
On July 1, 1954, Ellen Bryan Moore, Register of the State Land Office, and Allison R. Kolb, State Auditor, signed a supplemental conveyance designed to "correct" and "supersede" the September 9, 1938, transfer of property from the State to the BLD.[6] Pursuant to the 1954 instrument, the State did "grant, transfer, convey, deed and set over and deliver" the BLD property described by the instrument.[7] Significantly, following the property *192 description, the 1954 instrument provided specifically as follows: "Excepted therefrom are the bayous, lagoons, lakes, and bays and the beds thereof, under authority of R.S. 9:1101,"[8] a statute that includes a provision, as emphasized in footnote 8, that rescinds, revokes and cancels conveyances of "any navigable waters and the beds and bottoms thereof" from the State to any levee district.
Although this court had held in Commander, 202 La. 325, 11 So.2d 605, that the BLD "must be considered as a political subdivision of the State," the 1974 Louisiana State Constitution included a provision that allowed levee districts to be consolidated and merged into local government subdivisions, under certain conditions. Specifically, La. Const. Art. VI, § 16(A) provides as follows:
(A) Consolidation. A local governmental subdivision may consolidate and merge into itself any special district or local public agency, except a school district, situated and having jurisdiction entirely within the boundaries of the local governmental subdivision. Upon the consolidation and merger, the local governmental subdivision shall succeed to and be vested with all of the rights, revenues, resources, jurisdiction, authority, and powers of the special district or *193 local public agency. A consolidation and merger shall become effective only if approved by a majority of the electors voting thereon in the local governmental subdivision as a whole and by a majority of the electors voting thereon in the affected special district. A local public agency shall be consolidated and merged only if approved by a majority of the electors voting thereon in an election held for that purpose in the local governmental subdivision in which the agency is located.
The merger and consolidation of the BLD into the PPG was approved by a majority of voters during an April 15, 1975, special election. The effect of the consolidation and merger of a levee district with another local government subdivision pursuant to La. Const. Art. VI, § 16(A) is further qualified in La.Rev.Stat. 38:513(A). That statute provides as follows, presumably to facilitate the continuation of the collection of taxes to service outstanding bonds:
In addition to any rights, revenues, resources, jurisdiction, powers, authority, and functions granted by applicable provisions of this Chapter, any levee district reorganized, merged, and consolidated with a parish pursuant to Article VI, Sections 16 and 38 of the Constitution of Louisiana shall continue to have the rights, revenues, resources, jurisdiction, powers, authority, functions, and duties, including the levy and collection of any local assessment or forced contribution, authorized by law at the time of the reorganization, merger, and consolidation with a parish.
As previously noted, the basis of the res judicata argument asserted by Chevron and PPG in this case is Plaquemines Parish Government, 01-1027, 826 So.2d 14. That Tract 87 litigation involved competing claims for mineral royalties being derived from Tract 87. That case was initiated on April 17, 1990, when PPG filed a petition for declaratory judgment seeking a declaration of its ownership of Tract 87 and its entitlement to all future revenues derived from Tract 87. Id. at 1, 826 So.2d at 17-18. Thereafter, on June 29, 1990, Chevron filed a concursus proceeding seeking to determine whether PPG or the State of Louisiana, which had granted a competing lease on the property, owned the mineral rights to Tract 87. The court of appeal affirmed a district court judgment in favor of PPG, recognizing the continuing validity of Chevron's lease from BLD, PPG's predecessor. Id. This court denied the State writ application, whereupon the court of appeal judgment became a final judgment. Plaquemines Parish Government v. State, 02-1304 (La.9/13/02), 824 So.2d 1170.
Sometime after the decision in the Tract 87 litigation became final, Chevron claims that it sought confirmation that the State would not contest PPG's right to receive royalties derived from Unit Tract 1. When the State refused to provide such confirmation, Chevron filed this concursus and declaratory judgment proceeding, seeking to determine whether PPG or the State is entitled to receive the royalties from production derived from Unit Tract 1. Motions for summary judgment were filed by Chevron, PPG, and the other aligned defendants,[9] in which they argued, inter alia, *194 that the State's claim to royalties derived from Unit Tract 1 was barred by res judicata because of the final judgment in the Tract 87 litigation. The district court agreed, and granted summary judgment in favor of Chevron and PPG. The court of appeal affirmed. Chevron U.S.A., Inc. v. State, 07-0673 (La.App. 4 Cir. 11/21/07), 972 So.2d 363. This court granted the State's writ application challenging the court of appeal's decision. Chevron U.S.A. Inc. v. State, 07-2469 (La.3/14/08), 977 So.2d 919.

RES JUDICATA
The doctrine of res judicata in Louisiana is set forth in La.Rev.Stat. 13:4231, which was amended in 1990 to provide as follows:
Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
(1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
(2) If the judgment is in favor of the defendant, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
(3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.
Based on the language of the above statute, this court has established the following five elements that must be satisfied for a finding that a second action is precluded by res judicata: "(1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation." Burguieres v. Pollingue, 02-1385, p. 7 (La.2/25/03), 843 So.2d 1049, 1053. Since the 1990 amendment to the res judicata statute, this court considers the "chief inquiry" to be "whether the second action asserts a cause of action which arises out of the transaction or occurrence that was the subject matter of the first action." Id.
In this case, the first three elements for application of res judicata are clearly satisfied. The judgment in the Tract 87 litigation is valid, it is final, and the parties to the two cases are the same. Thus, the two issues that must be decided by this court are whether the court of appeal correctly concluded that the cause or causes of action asserted in this case existed at the time of the final judgment in the Tract 87 litigation, and whether the cause or causes of action asserted in this case arose out of the same transaction or occurrence that was the subject matter of the Tract 87 litigation. If either of those two elements are not satisfied in this case, the granting of summary judgment on the basis of res judicata was inappropriate.
The court of appeal noted that the first three elements for application of res judicata were present in this case, then disposed of the res judicata issue by concluding as follows:
The primary problem with the State's position is that beginning in 1943, the courts have recognized the validity of the 1938 BLD lease. See State v. Gulf *195 Refining Co., 202 La. 951, 13 So.2d 277 (1943). It is uncontested that the 1938 BLD lease contains Tracts 1 and 87 that have been leased to Chevron along with a number of other tracts. The State argues that the cause of action asserted by the appellees in the present action does not arise out of a transaction or occurrence which was the subject matter of the Tract 87 litigation. The State is incorrect because it narrowly focuses on Tract 87 versus Tract 1. The real cause of action in both cases is the immovable known as the 1938 BLD lease, not any single tract of land contained therein.
Chevron U.S.A., 07-0673 at 7, 972 So.2d at 368 (emphasis added). Thus, rather than consider whether the fourth element (whether the cause of action existed at the time of the final judgment in the first litigation) and fifth element (whether the cause(s) of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation) for application of res judicata were present in this case, the court of appeal simply found that the Tract 87 litigation and this case were based on the same "real cause of action."
As will be further discussed below, we disagree with the court of appeal's conclusion that the "real cause of action" in both this case and the Tract 87 litigation is "the immovable known as the 1938 lease." Id. Further, we find that the court of appeal did not apply the correct elements for determining whether the Tract 87 litigation is res judicata to this case. Whether the two cases are based on the same "real cause of action" is not and has never been the proper inquiry for determining whether a previous action is res judicata to a second action. Perhaps the court of appeal meant to find that the two cases have "identity of cause," which was a necessary element for application of res judicata prior to the 1990 amendment to Louisiana's res judicata law. However, since the amendment, the "chief inquiry" for determining whether a finding of res judicata is appropriate is whether the two actions arise out of the same "transaction or occurrence." Thus, the court of appeal should have at least considered whether this case and the Tract 87 litigation arose out of the same transaction or occurrence.
In order for this court to properly decide whether res judicata bars this case, we therefore consider whether the two cases arose out of the same transaction or occurrence. This court therefore must examine the final decision of the court of appeal in the Tract 87 litigation, Plaquemines Parish Government, 01-1027, 826 So.2d 14, to determine the transaction or occurrence that gave rise to that litigation. The Tract 87 litigation was originally filed by PPG as a declaratory judgment action seeking a declaration that PPG owned Tract 87, which was described by the court of appeal opinion as "a tract of land located within the fractional Section 20, Township 22 South, Range 30 East.". Id. at 1, 826 So.2d at 17. Thereafter, Chevron filed a concursus petition "contending that both the Cullen sublease [granted by PPG][10] *196 and State Lease No. 3263 cover a tract of land (Tract 87) that is claimed by both the PPG and the State, and as such it was uncertain as to whom it should pay royalties from production attributable to Tract 87." Id. at 2, 826 So.2d at 18 (emphasis added). According to the court of appeal, the district court granted judgment in favor of PPG on its own motion, "recognizing the continuing validity of the BLD lease." Id.
The court of appeal did implicitly recognize the validity of the BLD lease in the Tract 87 litigation. However, that simple fact does not necessarily mean that the Tract 87 litigation is res judicata to this case, and the court of appeal in this case erred in so holding. A review of the court of appeal opinion in the Tract 87 litigation reveals the court's recognition of the validity of the BLD lease in that case was grounded firmly in the context of the controversy presented by that case. That is, the Tract 87 litigation involved two competing leases, one granted by the State and one granted by BLD. Plaquemines Parish Government, 01-1027 at 1, 826 So.2d at 17. Given the fact that two competing leases had been granted affecting Tract 87, the court of appeal in that case was required to determine which of the two lessors had the right to lease the property. The court of appeal concluded, on the basis of the evidence in that case, that the BLD had the right to lease Tract 87 and therefore did validate the lease granted by the BLD to Chevron. Id. at 3, 826 So.2d at 18. However, the fact that the BLD lease was valid as to Tract 87 does not control the issue presented by this case, which involves an entirely different tract of land, located some three miles from Tract 87. The Tract 87 litigation was focused only on the specific tract of land at issue there-i.e., Tract 87,[11] and cannot be considered to bar the instant case-which involves Unit Tract 1.
As is apparent from the above discussion, the transaction or occurrence from which the Tract 87 litigation arose was not "the immovable known as the 1938 BLD lease," as the court of appeal indicated. *197 Rather, the transaction or occurrence giving rise to the Tract 87 litigation was the existence of two competing leases on Tract 87, one granted by the BLD and one granted by the State, and Chevron's uncertainty concerning which party was entitled to receive the royalties from the mineral lease it maintained on Tract 87.
In this case, the transaction or occurrence giving rise to the dispute is Chevron's uncertainty concerning the proper party entitled to receive the royalties deriving from Chevron's mineral lease on Unit Tract 1. The State is not, as Chevron and PPG seem to argue, seeking to invalidate Chevron's lease from the BLD of the property conveyed by the State to the BLD. Although a representative of the State allegedly told Chevron's counsel prior to the filing of the concursus and declaratory judgment action that it considers Unit Tract 1 to be unleased property, the State's answer in this case simply prays for "judgment . . . in its favor, recognizing the ownership of the State to the proceeds on deposit in the registry" of the court. Thus, as the record now exists, the transaction or occurrence giving rise to this litigation involves the competing claims to royalties derived from Unit Tract 1 by PPG and the State.
Another important difference between this case and the Tract 87 litigation is the fact that the State made no claims in the Tract 87 litigation, as it does in this case, that any of the land encompassed by Tract 87 was submerged by water in the year 1938 when the lease was granted. Rather, the State simply claimed in the Tract 87 litigation that ownership of some portion of Tract 87 had reverted to the State because that portion of the property had become inundated with water after the lease was granted in 1938. In this case, the State claims that some portion of Unit Tract 1 was submerged under water in 1938 and that ownership of that portion has never been transferred to the BLD. Because ownership of that portion of the property was allegedly never transferred to the BLD, that portion was never subject to the 1938 lease, the State asserts. This difference in the State's arguments also supports our finding herein that the two cases do not arise out of the some transaction or occurrence.
Because this case does not arise out of the same transaction or occurrence that gave rise to the Tract 87 litigation, the court of appeal improperly dismissed this case on grounds of res judicata. Such dismissal was not appropriate because the "chief inquiry" for application of res judicata (i.e., "whether the second action asserts a cause of action which arises out of the transaction or occurrence that was the subject matter of the first action") is not present. Burguieres, 02-1385 at 7, 843 So.2d at 1053.
We further find that Chevron and PPG have not shown that the fourth element for application of res judicata is satisfied under the facts of this case. Regarding that element, res judicata is appropriate only if "the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation." Burguieres, 02-1385 at 7, 843 So.2d at 1053. Nothing in the record addresses the existence of a cause of action for royalties derived from Unit Tract 1 at any time while the Tract 87 litigation was pending. For that reason also, the court of appeal improperly granted summary judgment based on res judicata. Thus, the lower court judgment granting summary judgment on the basis of res judicata is hereby reversed.

OTHER GROUNDS ALLEGED FOR GRANTING SUMMARY JUDGMENT
Chevron and PPG contend that, even if res judicata does not apply, the lower *198 courts properly granted summary judgment in their favor because they have nevertheless carried their burden of establishing PPG's right or receive all of the mineral royalties derived from Unit Tract 1. According to Chevron and PPG, they have proven the two necessary elements for entitlement to summary judgment i.e., (1) that no genuine issue of material fact exists, and (2) that they are entitled to judgment as a matter of law. La.Code Civ. Proc. art. 966. For the reasons set forth below, we find that Chevron and PPG have not carried their burden of showing that they are entitled to summary judgment for they have not presented proof of or legal support for these two necessary elements.

Remaining Genuine Factual Issues
Chevron and PPG claim that no genuine issues of material fact exist regarding PPG's entitlement to receive all of the royalties derived from Unit Tract 1. According to Chevron and PPG, the mineral rights on all of the property that constitutes Unit Tract 1 are owned by PPG. Ownership of all that property was conveyed to BLD by the State in 1938, Chevron and PPG assert. Further, they claim, the conveyance from the State to BLD, PPG's predecessor, did not except any mineral rights, so that the mineral rights were indeed conveyed along with the property. When BLD was consolidated with and merged into PPG in 1975, PPG became the owner of the property and the mineral rights, Chevron and PPG claim.
The State disputes the assertions of Chevron and PPG by making two arguments. First, the State claims that, assuming that the property was dry land in 1938 when it was transferred to the BLD, the property, at the time of this suit, included water bottoms inundated by the open waters of the Gulf of Mexico. Such water bottoms, the State argues, belong to the State, as a matter of law. La.Rev. Stat. 9:1101; Miami Corp. v. State, 186 La. 784, 173 So. 315, 322 (1936). Thus, the State claims, the portions of Unit Tract 1 that were dry land at the time of 1938 conveyance and thus were properly conveyed to BLD, reverted to the State's ownership when they became inundated by water.
Alternatively, the State contends that several water bottoms were present in Unit Tract 1 in 1938, and that those water bottoms, at least, were never conveyed to BLD.[12] In support of this argument, the State points to the fact that the 1954 conveyance, which corrected and superseded the 1938 conveyance, "[e]xcepted therefrom. . . the bayous, lagoons, lakes, and bays and the beds thereof, under authority of R.S. 9:1101." The State further asserts that the portions of Unit Tract 1 that consisted of water bottoms at the time of the 1938 conveyance could not have been transferred to BLD because the State was and is constitutionally prohibited from alienating water bottoms by La. Const. art. IX, § 3.[13]
*199 In the Tract 87 litigation, the State made an argument similar to its first argument herein. The State asserted in the Tract 87 litigation that it had the authority to grant a mineral lease on Tract 87 because, although the State conceded that Tract 87 was dry land in 1938, that tract had since become inundated by the waters of the Gulf of Mexico, at which time ownership of the property reverted to the State. The court of appeal disposed of that argument in the Tract 87 litigation by noting that "[o]wnership of `land' and ownership of mineral rights in such land are not necessarily one and the same." Plaquemines Parish Gov't, 01-1027 at ___, 826 So.2d at 20. The court of appeal found as follows:
La. R.S. 9:1152 clearly applies to the circumstances of the instant case. The BLD granted a mineral lease on land that later became water bottoms. While the State is now the owner of the water bottoms (due to the fact that somehow Tract 87 is now under the open waters of the Gulf of Mexico), the mineral rights are retained by PPG (successor to the BLD) as long as its lease granted in 1938 is in effect.
Id. at 9-10, 826 So.2d at 22.
We find that the court of appeal correctly concluded in the Tract 87 litigation that the reversion of ownership to the State of dry land in 1938 that is now inundated by water does not control the issue of entitlement to the royalties from the Chevron lease. Under La.Rev.Stat. 9:1152(A),[14] property that reverts to the State's ownership is subject to an "imprescriptible and inalienable mineral servitude" in favor of the agency or political subdivision that granted a mineral lease when it had the right to do so. For the same reason that the court of appeal found in the Tract 87 litigation that the State did not own the mineral rights to any part of Tract 87 that was dry land in 1938, any part of Unit Tract 1 that was dry land in 1938 was property conveyed to BLD, and BLD therefore had the right to grant the mineral lease affecting that property to Chevron. The ownership of the water bottoms on any part of the Unit Tract 1 that later became inundated by the waters of the Gulf of Mexico did in fact revert to the State. However, BLD continued to enjoy the "imprescriptible and inalienable servitude" granted by La.Rev.Stat. 9:1152, and BLD is entitled to the royalties from that property. Thus, there is no merit to the State's argument that it is entitled to receive the royalties from any part of Unit Tract 1 that has, since 1938, become inundated by the waters of the Gulf of Mexico.
However, La.Rev.Stat. 9:1152 does not address the State's alternative argument *200 that it is entitled to receive the royalties derived from portions of Unit Tract 1 that were water bottoms at the time of the 1938 conveyance such that the mineral rights were never transferred to BLD because those portions of the property were not included in the 1938 conveyance. The Tract 87 litigation did not address this issue, nor have the parties pointed to any cases in which a Louisiana court has addressed this issue. Thus, the State's alternative argument regarding its entitlement to royalties on portions of Unit Tract 1 that were water bottoms in 1938 raises an unanswered question that may have merit.
Chevron and PPG assert however that the attachments to their motions for summary judgment are sufficient to show that no genuine issue of material fact remains regarding whether there existed water bottoms in Unit Tract 1 at the time of the 1938 conveyance. In support of this argument, they point primarily to the affidavit of George J. Castille III. After setting forth his qualifications and his methodology, Mr. Castille's affidavit states as follows:
I concluded from my review and analysis of these data that as of the time of transfer of this Tract 1 area into the Buras Levee District in September of 1938, the entirety of the area, which is now designated as Tract 1 in Exhibit 1, was land at the time of the transfer.
On this issue, the State attached to its opposition to the motions for summary judgment filed by Chevron and PPG, the affidavit of John P. Evans, Jr., P.L.S., Chief of Titles, Surveys and GIS with the State of Louisiana, Division of Administration  Office of State Lands. Mr. Evans stated, in pertinent part, as follows:
As to the search and examination conducted, Appearer attests that the maps attached hereto as Exhibit 1 though 6 are the most significant of the United States Geological Survey quadrangle maps on file with the Office of State Lands which are pertinent to Unit Tract 1 and which depict Little Pass de Wharf, as well as other small lakes and lagoons, as traversing and/or situated upon Unit Tract 1.
The court of appeal in this case gave only scant attention, that was hardly persuasive, to this issue, stating as follows:
[T]o the extent that Tract 1 may have contained certain bodies of water, we note that the 1938 transfer specifically excluded the bayous, lagoons, lakes, and bays and beds thereof under authority of La. R.S. 9:1101. Therefore, the fact that these types of water bodies may have been present in Tract 1 at the time of the initial transfer is of no moment.
Chevron U.S.A., Inc., 07-0673 at 5, 972 So.2d at 368 (emphasis added).
As indicated by the above highlighted statement, the court of appeal apparently found that a factual issue remains in this case regarding the possible existence of water bottoms on Unit Tract 1 in 1938, but nevertheless concluded that that remaining factual issue was not "genuine" because the existence of such water bottoms "is of no moment," whatever that was intended to mean. Thus, the court of appeal concluded that the existence of this conceded factual issue did not prevent the granting of summary judgment. Although we agree with the court of appeal's apparent finding that a factual issue remains, we disagree with its conclusion that the remaining factual issue is not "genuine" because the possible existence of water bodies in 1938 is "of no moment." In fact, that remaining factual issue is perhaps the most important issue in the case. The existence of water bottoms in Unit Tract 1 at the time of the 1938 conveyance is certainly of serious consequence regarding *201 the State's entitlement to any part of the royalties being derived from that tract because any water bottoms that existed on Unit Tract 1 at the time of the 1938 transfer were excepted from the transfer by the 1954 supplemental conveyance, such that ownership of the water bottoms has always been vested in the State. We find that a genuine issue of material fact remains in this case regarding the existence of water bottoms in Unit Tract 1 at the time of the 1938 transfer and that summary judgment is therefore not appropriate. And that is so for the reasons more fully stated in the immediately preceding paragraph of this opinion.

Entitlement to judgment as a matter of law
Chevron and PPG seek to minimize the significance of the remaining genuine issue of material fact discussed above by arguing that, even if water bottoms existed in Unit Tract 1 at the time of the 1938 transfer, they are nevertheless entitled to judgment as a matter of law. According to Chevron and PPG, the question of the State's continued ownership of water bottoms after the 1938 transfer is immaterial because the BLD, as a political subdivision or agent of the State, granted the mineral lease to Chevron on the State's behalf and the State is therefore a party to the lease and thus prohibited from attacking the validity of the lease.
This argument perhaps best reveals the fundamental flaw in the position held by Chevron and PPG throughout this case. Chevron and PPG have placed so much reliance on the validity of the lease from the BLD to Chevron that they have failed to properly address some of the valid arguments set forth by the State. As we have already stated, the State is not attacking the validity of Chevron's lease, at least not on the face of the documents in the record. Rather, the State appears to be conceding the validity of the lease (at least for purposes of this litigation), but is simply seeking any portion of the royalties derived from Unit Tract 1 that might be attributable to property on which it continues to own the mineral rights because it never conveyed some of the property (the land that was inundated by water in 1938) to BLD. Thus, the fact that the Chevron lease may be valid is not material to the issues in this case.
Chevron, PPG, and aligned defendant, Robert L. Lobrano, support their argument that BLD granted the mineral lease on Unit Tract 1 to Chevron as an agent of the State by citing the following language from this court's decision in Board of Commissioners of the Orleans Levee District v. Department of Natural Resources: "The well settled principle that a levee district is a creature or agency of the state was confirmed by the 1974 Louisiana Constitution." 496 So.2d 281, 289 (La.10/20/86). However, we find the fact that a levee district is a "creature or agency" of the State does not control the issue presented in this case, as Chevron and PPG suggest, for the reasons set forth below.
First, we note that Chevron and PPG fail to explain the significance of the fact that the BLD is a "creature or agency" of the State to the issues presented herein. Even if, as Chevron and PPG argue, BLD granted the lease to Chevron on behalf of the State, that fact does not necessarily mean that the State itself is not entitled to receive any part of the royalties from the mineral lease, if the State can prove that some portions of Unit Tract 1 were never conveyed to the BLD because they constituted water bottoms at the time of the 1938 conveyance. Simply arguing that BLD is or was the State, without any citations to law or policy that explain the *202 significance of that fact, is not sufficient to prove that PPG should receive all the royalties derived from Unit Tract 1 and/or that Chevron and PPG are entitled to judgment as a matter of law.
Second, the argument that the BLD is the State ignores an important reality. The fact is that, even though this court has held that levee districts are political subdivisions, agencies, and/or creatures of the State, the BLD was consolidated and merged with PPG in 1975, and PPG is unquestionably not the State of Louisiana. Chevron's and PPG's argument that they are entitled to judgment as a matter of law simply ignores the fact that they are, in reality, asserting that all the royalties being derived from Unit Tract 1 should go to PPG, despite the fact that a remaining genuine issue of material fact remains regarding the State's ownership of mineral rights on some portions of Unit Tract 1 that may have been water bottoms at the time of the 1938 conveyance. The parties have not cited any law or cases setting forth the significance of the consolidation and merger of levee boards with local governmental subdivisions, a consolidation and merger which is allowed by La. Const. Art. VI, § 16(A).
Given the disputed facts relative to the condition of Unit Tract 1 in 1938 and the consequential issues of law, we find that Chevron and PPG have not proved that they are entitled to judgment as a matter of law and thus have not carried their burden of proving their entitlement to summary judgment.

DECREE
For the above and foregoing reasons, the court of appeal judgment affirming the district court's decision to grant summary judgment in favor of Chevron and PPG on the basis of res judicata is reversed. Application of res judicata to this case is inappropriate because this case does not arise out of the same "transaction or occurrence" as the Tract 87 litigation. We further find that Chevron and PPG have not otherwise proven that they are entitled to summary judgment because they have failed to show that no genuine issues of material fact remain and that they are entitled to judgment as a matter of law. The case is remanded to the district court for further proceedings consistent with this decision.
REVERSED AND REMANDED.
TRAYLOR and KNOLL, JJ., dissent for reasons assigned by WEIMER, J.
WEIMER, J., dissents and assigns reasons.
WEIMER, Justice dissenting.
I respectfully dissent. I am of the opinion that the majority too narrowly constrains the concept of res judicata as stated in LSA-R.S. 13:4231. With the rewriting of LSA-R.S. 13:4231 in 1990, the applicability of res judicata in Louisiana was substantially broadened.
Most of the confusion in Louisiana surrounding res judicata prior to 1990 concerned whether there was an "identity of cause." With the substantial amendment to the res judicata statute, however, the chief inquiry is whether the second action asserts a cause of action which arises out of the transaction or occurrence that was the subject matter of the first action. Avenue Plaza, L.L.C. v. Falgoust, 96-0173, p. 6, (La.7/2/96), 676 So.2d 1077, 1080. The significant change was enacted to broaden the application of res judicata in order to avoid piecemeal litigation. See Reeder v. Succession of Palmer, 623 So.2d 1268, 1271 (La.1993).
Where I depart from the majority opinion is that I am convinced the issue of *203 entitlement to royalties was resolved in Plaquemines Parish Government v. State, 01-1027, 01-1028 (La.App. 4 Cir. 4/10/02), 826 So.2d 14, writ denied, 02-1304 (La.9/13/02), 824 So.2d 1170, 1171. Therefore, the subject matter of the Tract 87 litigation and this Tract 1 litigation is the same: the 1938 BLD lease, not the individual tracts. The lower courts correctly dismissed the action on the grounds of res judicata because they focused on the validity of the mineral lease in its entirely rather than the claims involving the separate tracts (Tract 87 and Tract 1). The majority's reversal of the judgment opens the door to litigation by the State of every individual tract covered by the 1938 lease, the validity of which lease has been recognized judicially since 1943. See State v. Gulf Refining Co., 202 La. 951, 13 So.2d 277 (1943). Such piecemeal litigation is the antithesis of the changes to the concept of res judicata.
I would affirm the judgment.
NOTES
[*] Retired Judge Lemmie O. Hightower, sitting ad hoc for Kimball, J., recused.
[1] The geographical limits of the BLD were described as follows in 1894 La. Act. No. 18, § 1:

all the territory contained within the parish of Plaquemines on the right or west bank of the Mississippi river beginning at the lower line of Riceland plantation and extending to the Jump on the west or right bank of the said Mississippi river and including all lands belonging and forming part of the parish of Plaquemines south of a line drawn from the lower line of Riceland plantation to the limits of Harrang Canal on Bayou Lafourche.
[2] The limits of the BLD were described as follows:

all the territory contained within the Parish of Plaquemines on the West Bank of the Mississippi River, south of the line of Riceland Plantation to the limits of Harang Canal on Bayou Lafourche and extending to the "Jump", including all the lands made by the said "Jump" crevasse to the lower boundary of West Bay. . . .
[3] The lands conveyed were described as follows:

SW¼ of Sec. 3; S½ of NE¼ & S½ of NW ¼ & S½ of Sec. 4; SE¼ & NW¼ south of Red Pass and SW¼ of Sec. 5; Frl. Sec. 6, south of Red Pass; all Frl. Secs. 7 & 8; E½ of NE¼, W½ of NW¼, E½ of SE¼ & W½ of SW¼ of Sec. 12; W ½ of NW¼ & SW¼ & NE¼ of Sec. 13; all Sec. 16; frl. Secs. 17, 18, 20 & 21; all Sec. 24; N½ of Sec. 26; N½ of Sec. 27; Frl. Secs. 28, 29, 33, 34 & 35, all in T. 22 S.R. 30 E, S.E. Dist. West of River.
All Frl. Secs. 1, 2, 3, 10, 11, 12, 13, 14, 15, 22, 23 & 24, to the lower boundary of West Bay, all in T. 23 S.R. 30 E., S.E. Dist. West of River.
Frl. Secs. 27, 34 & 35, in T. 21 S.R. 31 E., lying west of lands embraced in C.C. Packard patent No. 526, Vol. 15, page 261.
That part of Frl. E½ of NW¼ & W½ of SE ¼ Sec. 2; and that part of Frl. E½ of Secs. 11, 14, 23, 26 & 35 lying west of lands embraced in R.M. White patent No. 4058, Vol. 27, page 32; all of Sec. 16; W½ of Sec. 19; Frl. NE ¼ Sec. 24; all in T. 22 S.R. 31 E., S.E. Dist. West of River.
That part of Frl. SE¼ of Sec. 2 and that part of Frl. W ½ of Secs. 12 and 13 lying west of lands embraced in Thos, Bullen Patent No. 4478, Vol. 27, page 241; Frl. SW¼ Sec. 3; Frl. S½ of Sec. 6, Frl. E½ of SE¼ Sec. 5; Frl. E½ of E½ of Sec. 8; all of Frl. Sec. 9; that part of Frl. N½ of Sec. 14 lying west of land embraced in Thos. Bllen patent No. 4478, Vol. 27, page 241; Frl. S½ of Sec. 14; Frl. NE¼ and Frl. SW¼ Sec. 23; Frl. Secs. 16, 7, 18 and 19; Frl. NW¼ Sec. 22; Frl. E½ of Sec. 27; Frl. E½ of Sec. 30; Frl. NE¼ Sec 31; Frl. W½ of Sec. 32 and Frl. SE¼ Sec. 33, all in T. 23 S.R. 31 E., S.E. Dist. West of River.
[4] Although the parties do not address this issue, we note that Chevron's lease from BLD is valid under the doctrine of after-acquired title, even though it was granted prior to the official conveyance of the land to the lessor. See St. Landry Oil & Gas Co. v. Neal, 166 La. 799, 118 So. 24 (1928) (holding that title to property sold to another by a vendor who only later acquires title vests immediately upon sale in the vendee).
[5] This conveyance is not in the record and the parties do not address this description of the land in the original lease. Rather, the parties apparently agree that title was actually conveyed by the instrument signed by Ms. Grace and Mr. Baynard on September 9, 1938, and recorded in Plaquemines Parish in COB 91 Folio 305 on September 13, 1938.
[6] The 1954 instrument states that it was completed by the Register of the State Land Office and the State Auditor "by virture [sic] of and in pursuance to the authority granted to [them] by R.S. 38:791 Louisiana Revised Statutes of 1954 and being requested to do so by the Plaquemines Parish Police Jury as the governing body of the [BLD]." La.Rev.Stat. 38:791 of the 1950 Revised Statutes, which was "vacated by the amendment and reenactment of Chapter 4 of Title 38 of the Louisiana Revised Statutes by Acts 1985, No. 785, § 1," provided for transfer of lands from the State to the BLD, and contained language very similar to that used in 1910 La. Act. No. 205.
[7] The property transferred by the State to the BLD by the 1954 instrument were described as follows:

SW¼ of Sec. 3; S½ of NE¼ & S½ of NW ¼ & S½ of Sec. 4; SE¼ & NW¼ south of Red Pass and SW¼ of Sec. 5; Frl. Sec. 6, south of Red Pass; all Frl. Secs. 7 & 8; E½ of NE¼, W½ of NW¼, E½ of SE¼ & W½ of SW¼ of Sec. 12; W ½ of NW¼ & SW¼ & NE¼ of Sec. 13; all Sec. 16; Frl. Secs. 17, 18, 20 & 21; all Sec. 24; N½ of Sec. 26; N ½ of Sec. 27; Frl. Secs. 28, 29, 33, 34 & 35, all in T. 22 S.R. 30 E, S.E. Dist. West of River.
All Frl. Secs. 1, 2, 3, 10, 11, 12, 13, 14, 15, & 24, to the lower boundary of West Bay, all in T. 23 S.R. 30 E., S.E. Dist. West of River.
That part of Frl. E½ of NW¼ & W½ of SE ¼ Sec. 2; and that part of Frl. E½ of Secs. 11, 14, 23, 26 & 35 lying west of lands embraced in R.M. White patent No. 4058, Vol. 27, page 32; all of Sec. 16; W½ of Sec. 19; Frl. NE ¼ Sec. 31; Frl. E½ of E½ of Sc. 32; Frl. E ½ of Sec. 33; Frl. NW¼ & SE¼ of Sec. 34; all in T. 22 S.R. 31 E., S.E. Dist. West of River.
That part of Frl. SE¼ of Sec. 2 and that part of Frl. Secs. 12 and 13 lying west of lands embraced in Thos, Bullen Patent No. 4478, Vol. 27, page 241; Frl. SW¼ Sec. 3; Frl. S½ of Sec. 6; Frl. E½ of E½ of Sec. 8; all of Frl. Sec. 9; that part of Frl. N½ of Sec. 14 lying west of land embraced in Thos. Bullen patent No. 4478, Vol. 27, page 241; Frl. S ½ of Sec. 14; Frl. NE¼ and Frl. SW¼ Sec. 23; Frl. Secs. 16, 17, 18 and 19; Frl. NW¼ Sec. 22; Frl. E½ of Sec. 27; Frl. E½ of Sec. 30; Frl. NE¼ Sec 31; Frl. W ½ of Sec. 32 and Frl. SE¼ Sec. 33, all in T. 23 S.R. 31 E., S.E. Dist. West of River.
The above description of the property transferred does differ in some particulars from the description of the property transferred by the 1938 instrument.
[8] La.Rev.Stat. 9:1101 provides as follows:

The waters of and in all bayous, rivers, streams, lagoons, lakes and bays, and the beds thereof, not under the direct ownership of any person on August 12, 1910, are declared to be the property of the state. There shall never be any charge assessed against any person for the use of the waters of the state for municipal, industrial, agricultural or domestic purposes.
While acknowledging the absolute supremacy of the United States of America over the navigation on the navigable waters within the borders of the state, it is hereby declared that the ownership of the water itself and the beds thereof in the said navigable waters is vested in the state and that the state has the right to enter into possession of these waters when not interfering with the control of navigation exercised thereon by the United States of America. This Section shall not affect the acquisition of property by alluvion or accretion.
All transfers and conveyances or purported transfers and conveyances made by the state of Louisiana to any levee district of the state of any navigable waters and the beds and bottoms thereof are hereby rescinded, revoked and canceled.
This Section is not intended to interfere with the acquisition in good faith of any waters or the beds thereof transferred by the state or its agencies prior to August 12, 1910.
(Emphasis added.)
[9] Chevron filed this case as a concursus proceeding, and ordinarily would not necessarily be aligned with any of the defendants. However, when it filed its motion for summary judgment based on res judicata, Chevron aligned itself with PPG. The attachments to Chevron's motion for summary judgment indicate that Chevron opposes the State in this case because the State has indicated that it considers at least some of the property located in Unit Tract 1 to be "unleased." Accordingly, Chevron is seeking to protect its right to remove minerals from all of Unit Tract 1 pursuant to its lease with the BLD.
[10] The introduction to the Plaquemines Parish Government case is clear that Tract 87 is located within the geographical limits of the BLD and that the BLD granted a mineral lease on the property to Delta Development on June 11, 1938, 01-1027 at 1, 826 So.2d at 17. However, the introduction then says that "Delta subleased the area to H.R. Cullen in 1956." Id. Nothing in the record in this case indicates that Unit Tract 1 was ever leased or subleased to anyone named Cullen. In fact, the record in this case indicates that Delta Development leased all of the property conveyed by the State to the BLD in 1938, including both Tract 87 and unit Tract 1, then subleased it all to Gulf Refining in 1939. None of the parties to this case has recognized or explained the apparent inconsistency between the statement in the Tract 87 litigation that the property was subleased to H.R. Cullen in 1956, and the apparent agreement among the parties to this case that all the property was subleased to Gulf Refining in 1939.
[11] That the Tract 87 litigation was focused exclusively on the competing claims to Tract 87 is clear from the court of appeal's conclusions on the various errors assigned by the State in that case. First, the court found that PPG had a right to bring its action and that the district court did not err in "denying the State's peremptory exception of no right of action and in its ruling that PPG obtained ownership of certain mineral rights affecting Tract 87 when the BLD merged and consolidated into PPG." Id. at 7, 826 So.2d at 20 (emphasis added). Second, the court found that, "[b]ecause there is no evidence as to exactly how Tract 87 came to be covered by the open waters of the Gulf of Mexico, the trial court was correct in denying the State's motion for summary judgment, and in the alternative, its motion in limine." Id. at 9, 826 So.2d at 21 (emphasis added). Fourth, the court found that the district court "clearly had authority to issue a ruling on its own motion when it concluded that the State's lease was null and void" based on its conclusion "that there was continuous ownership of Tract 87 mineral rights by the BLD since the Delta lease as granted in 1938 and ownership of these rights did not change as a consequence of the merger and consolidation of the BLD into PPG in 1975." Id. at 10, 826 So.2d at 22 (emphasis added). Fifth, the court rejected the State's claim that the district "erred in rendering its judgment without a proper legal description of Tract 87." Id. at 3, 826 So.2d at 18(emphasis added). Thus, virtually all of the arguments of the parties and all of the court of appeal's findings in the Tract 87 litigation were directed specifically to the issue of ownership of that specific tract of land.
[12] The State claims that the attachments to its opposition to the motions for summary judgment filed by Chevron and PPG show that Little Pass de Wharf and other small lakes and lagoons were present on Unit Tract 1 in 1938.
[13] La. Const. art. IX, § 3 provides as follows:

The legislature shall neither alienate nor authorize the alienation of the bed of a navigable water body, except for purposes of reclamation by the riparian owner to recover land lost through erosion. This Section shall not prevent the leasing of state lands or water bottoms for mineral or other purposes. Except as provided in this Section, the bed of a navigable water body may be reclaimed only for public use.
[14] La.Rev.Stat. 9:1152(A) provides as follows:

With regard to lands previously acquired or which may be acquired hereafter by the state of Louisiana from an agency or political subdivision of the state due to subsidence or erosion or other action of a navigable river, stream, bay, or lake or arm of the sea occurring after the effective date of the Louisiana State Constitution of 1921 and which are not subject to a mineral lease granted by the state of Louisiana on the effective date hereof, and which are subject to a mineral lease granted by such agency or political subdivision, or its governmental predecessor, on the effective date hereof, the state of Louisiana hereby grants to the agency or political subdivision, or its governmental successor, from which it acquired or may acquire such lands an imprescriptible and inalienable mineral servitude affecting all minerals underlying the lands so acquired. Any such servitude shall be treated as having been granted on the date of the change in ownership of such lands and the agency or political subdivision holding such servitude is granted the authority to lease or otherwise manage the mineral rights affected thereby in accordance with law.