| ELRAY AND BRENDA LEGE | * | NO. 2020-CA-0252 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| UNION CARBIDE | * | |
| CORPORATION | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

\* \* \* \* \* \* \*

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2016-05598, DIVISION "A"
Honorable Ellen M. Hazeur, Judge
\* \* \* \* \* \*
**Judge Dale N. Atkins**
\* \* \* \* \* \*
(Court composed of Judge Regina Bartholomew-Woods, Judge Paula A. Brown, Judge Dale N. Atkins)

Lewis O. Unglesby
Lance C. Unglesby
Jordan L. Bollinger
Jamie F. Gontarek
Christopher J. Murrell
UNGLESBY LAW FIRM
246 Napoleon Street
Baton Rouge, LA 70802

Jeffrey T. Gaughan
Wells T. Watson
BAGGETT MCCALL BURGESS WATSON & GAUGHAN
3006 Country Club Road
Lake Charles, LA 70605

COUNSEL FOR PLAINTIFFS/APPELLEES

Brian P. Marcelle
Darryl J. Foster
L. David Adams
David E. Redmann, Jr.
BRADLEY MURCHISON KELLY & SHEA LLC
1100 Poydras Street, Suite 2700
New Orleans, LA 70163

Michael S. French (*pro hac vice*)
Tiffany N. Watkins (*pro hac vice*)
WARGO & FRENCH, LLP
999 Peachtree Street, NE, 26th Floor
Atlanta, GA 30309

H. Alston Johnson, III
Kevin W. Welsh
PHELPS DUNBAR LLP
400 Convention Street
II City Plaza, Suite 1100
P. O. Box 4412
Baton Rouge, LA 70821-4412

COUNSEL FOR DEFENDANT/APPELLANT


**AMENDED AND AFFIRMED AS AMENDED**
**APRIL 1, 2021**

*DNA*
*RBW*
*PAB*

This is a mesothelioma wrongful death and survival action. Appellant, Birla Carbon USA, Inc. ("Birla"), appeals the trial court's November 5, 2019 judgment that found Birla fifty-one percent at fault for the death of Appellee, Elray Lege, from mesothelioma, and awarded $4 million to Mr. Lege for his pain and suffering; $2 million to Mr. Lege's wife, Brenda Lege, for wrongful death; $500,000 to each of Mr. Lege's four adult children; medical expenses in the amount of $198,405.06; and funeral expenses in the amount of $16,074.29. For the following reasons, we amend the trial court's judgment awarding wrongful death damages to two of Mr. Lege's adult children, Rodney Lege and Kristina Lege LeBlanc, and affirm the trial court's judgment as amended.

## FACTUAL BACKGROUND

Mr. Lege began working as a helper and insulator at a Texaco plant in late 1971 or early 1972, while employed by three different companies. In 1975, Mr. Lege began working for The Cajun Company as an insulator. Through his work with The Cajun Company, Mr. Lege was assigned to work at various plants, including Union Carbide, DuPont, and a different Texaco plant, until 1978. In late 1978 or early 1979, while still employed by The Cajun Company, Mr. Lege began

1

working at the Cabot Corporation carbon black plant in Centerville, Louisiana. During this time, Mr. Lege would sometimes be sent across the highway to work at another plant owned by Columbian Chemicals (Birla's predecessor). As an insulator, Mr. Lege was responsible for tearing out and installing insulation which contained asbestos. As a result, Mr. Lege was exposed to a significant amount of asbestos while he worked for The Cajun Company.

Three decades later, beginning in 2013, Mr. Lege began to experience breathing difficulties while engaging in physical activity. By November 2015, Mr. Lege was having regular breathing difficulties, and sought medical attention. Mr. Lege was diagnosed with mesothelioma in March 2016. Mr. Lege died from mesothelioma in March 2017.

## PROCEDURAL HISTORY

On June 3, 2016, Mr. Lege filed suit in Orleans Parish Civil District Court, naming a number of defendants, including so-called "premises" defendants such as Texaco, Union Carbide, DuPont, Cabot and Birla. Mr. Lege also named Orleans Parish defendant Taylor-Seidenbach, a distributor of asbestos-containing products. The Leges settled with all of the other defendants including Texaco, Union Carbide, DuPont, Cabot, and Taylor-Seidenbach; only Birla remained at the time of trial. Mr. Lege died of mesothelioma in 2017, and this action was converted into a wrongful death and survival action. Mr. Lege's wife, Brenda Lege, and his four adult children, Kristina Lege LeBlanc, Rodney Lege, Bridgette Lege Stelly, and Tyler Lege (collectively, the "Leges"), were substituted as plaintiffs.

On July 20, 2016, Birla filed an answer to Mr. Lege's petition for damages and included an exception of improper venue. Because of the need for discovery on the facts affecting venue, the trial court ordered that the exception of improper

2

venue would not be set for hearing until discovery was complete. On July 2, 2019, Birla filed a motion to set its exception of improper venue for hearing, arguing that discovery was complete and that it demonstrated that venue was improper in Orleans Parish and was more appropriate in St. Charles Parish. Birla argued that venue was improper in Orleans Parish because: (1) none of Mr. Lege's allegations included exposure to asbestos in Orleans Parish; and (2) no evidence established that Mr. Lege was exposed to asbestos due to activities from an Orleans Parish defendant, despite the fact that Mr. Lege named the Orleans Parish defendant Taylor-Seidenbach. Birla contended that Mr. Lege was not familiar with Taylor-Seidenbach and did not say that he ever worked for Taylor-Seidenbach or saw anything with Taylor-Seidenbach's name on it.

During the hearing on the exception on August 23, 2019, Birla admitted that if it later wanted to receive credit for any settlement Mr. Lege may reach with Taylor-Seidenbach, it would need to prove that Taylor-Seidenbach exposed Mr. Lege to asbestos, and that it did not have the evidence to prove that Mr. Lege was exposed to asbestos by Taylor-Seidenbach. The Leges countered that they had properly alleged that Birla, along with Taylor-Seidenbach and the other defendants, were solidary obligors. The Leges also responded that their claims against Taylor-Seidenbach were based on Taylor-Seidenbach being an asbestos supplier and distributor to another defendant, Union Carbide, where Mr. Lege did work. The Leges maintained that they had already settled with Taylor-Seidbenbach and, thus, did not need to prove their case against Taylor-Seidenbach to maintain venue. The trial court found that the Leges properly pleaded that Taylor-Seidenbach is a joint tortfeasor and is solidarily liable for Mr. Lege's injuries. On September 3, 2019, the trial court denied Birla's exception of improper venue.

On October 3, 2019, prior to trial, Birla filed a motion *in limine* and supplemental exception of improper venue. Birla once again argued that the Leges' only basis for venue in Orleans Parish was the alleged solidary obligation of Birla with Taylor-Seidenbach, who had been dismissed after settling with the Leges prior to trial. Birla asked that the trial court order the Leges to declare before trial whether Taylor-Seidenbach is a solidary obligor with Birla for the purposes of both venue and apportionment of damages. Birla contended that such a ruling would prevent the inconsistent outcomes of having Taylor-Seidenbach be found a solidary obligor for purposes of venue, but not for assessment of damages. The Leges responded, and the trial court agreed, that Taylor-Seidenbach was a solidary obligor for venue purposes but that it was Birla's burden to show Taylor-Seidenbach's fault in order to get a credit for its settlement with the Leges. On the morning of trial, the trial court denied the motion *in limine* and the re-urged exception of improper venue.

The matter proceeded to jury trial on October 7, 2019, and concluded on October 14, 2019. During trial, Mr. Lege's pre-trial deposition testimony as well as that of his treating physician Dr. Kelvin Raybon was played for the jury.[1]

**THE LEGES' CASE-IN-CHIEF**

*Mr. Lege*

In his pre-trial deposition testimony, Mr. Lege testified that, while working for The Cajun Company in late 1978 or early 1979, he worked at the carbon black plant in Centerville, Louisiana as an insulator, where he was responsible for tearing

---

[1] This Court notes that, though the record is clear these depositions were played for the jury, transcripts of those portions of the depositions the jury heard were not made a part of the record before this Court, nor did the court reporter transcribe the video depositions as they were played for the jury. This Court gleaned from other parts of the record the substance of both Mr. Lege's and Dr. Raybon's testimony.

4

out and installing insulation, which contained asbestos. In this job, which required a lot of physical labor, Mr. Lege would tear down insulation held on "bag collectors" by chicken wire and put up more insulation on the bottom of the "bag collectors" at Columbian. After tearing out the old insulation, Mr. Lege install "block" insulation and "mud." As a result, Mr. Lege alleged, he was exposed to a significant amount of asbestos. Mr. Lege stated that during this time, he would occasionally be sent across the highway to work at another plant owned by Columbian Chemicals where he was exposed to asbestos. Mr. Lege stated that he worked at the Columbian plant for approximately four months.

*Dr. Kelvin Raybon*

Dr. Raybon testified that, prior to becoming the medical director at Augusta Health Center in Fishersville, Virginia, he had a practice in Lafayette, Louisiana where he treated Mr. Lege. Dr. Raybon explained that, while he was in Lafayette, he was the director of the oncology program at University Medical Center in Lafayette. Dr. Raybon testified that, according to Mr. Lege's medical records, he began having trouble breathing in July 2013, but Dr. Raybon did not start treating Mr. Lege until March 2016 after Mr. Lege had a biopsy in February 2016 that confirmed a malignant growth—a tumor—in his right lung. Dr. Raybon explained that he had Mr. Lege undergo chemotherapy, but determined that Mr. Lege's condition was not improving his tumors. Dr. Raybon recommended Mr. Lege stop chemotherapy after seeing the physical toll it was taking on Mr. Lege.

Dr. Raybon testified that mesothelioma is a painful disease and that, as a cancer, it "literally invades" the body. Dr. Raybon determined that Mr. Lege's mesothelioma was fatal because there was no way to keep the tumor from growing or to remove it. Dr. Raybon explained that, in Mr. Lege's case, the cancer caused

5

his right lung to fail. Eventually, Dr. Raybon directed Mr. Lege to go to hospice in December 2016, expecting that he would not live longer than six months. Dr. Raybon opined that exposure to asbestos was consistent with Mr. Lege's mesothelioma presentation.

*Dr. Victor Roggli*

The jury also heard testimony from Dr. Victor Roggli, an expert lung and mesothelioma pathologist. Dr. Roggli testified that Mr. Lege had mesothelioma and, in his opinion, there was a very high probability that Mr. Lege's mesothelioma was caused by asbestos exposure. Dr. Roggli explained that asbestos has no taste or smell, and often, one can be exposed to it without knowing it. Dr. Roggli testified that he found that people who worked as insulators, such as Mr. Lege, had the highest level of mesothelioma caused by asbestos. Dr. Roggli also testified that, depending on where a person works, what type of asbestos they may be exposed to, and how much dust is stirred up, a person could be exposed to double the risk of getting mesothelioma in a smaller amount of time.

*Frank M. Parker, III*

Frank M. Parker, III, an expert industrial hygienist also testified on behalf of the Leges. Mr. Parker testified that he worked with Cities Service, the company that owned Columbian Chemicals, in 1977 and was engaged in abatement projects for Columbian Chemicals. Mr. Parker testified that in 1972, OSHA required plants to identify where there was asbestos in their plants, and he has never seen any document that shows Columbian did this. Mr. Parker explained that he participated in an asbestos abatement project at Columbian in the 1980s, after Mr. Lege worked in the plant, where 77 tons of asbestos were removed from the plant. Mr. Parker further testified that he has never seen where Columbian replaced their asbestos-

6

containing insulation in its plants with non-asbestos containing insulation, nor did it direct anyone to do so.

Mr. Parker further explained that the insulation used would have created more and more dust as it was being torn out, 200-plus fibers per cubic centimeter ("cc"), which is 2,000 times the current standard. He testified that, as an industrial hygienist, he checks to see how many fibers of asbestos per cubic centimeters were in the breathing zone to determine how much asbestos to which a person's body may have been exposed. He testified that he determined there was upwards of 250 fibers per cc at the Columbian plant—2,500 times a current tolerable level for a person. Mr. Parker characterized Mr. Lege's work at Columbian as "very physical" and "chesty" work, indicating that Mr. Lege would have been breathing very fast while doing the work, causing him to inhale even more asbestos fibers. Mr. Parker opined that, as a result, Mr. Lege could have received a year's worth of asbestos exposure in a single day's work at Columbian.

*Candice Pommier*

Mr. Lege's hospice nurse, Candice Pommier, also testified at trial. Ms. Pommier stated that she met the Leges in December 2016. She took care of Mr. Lege for the last four months of Mr. Lege's life before he passed away in March 2017. She testified that Mr. Lege struggled with accepting that he was going to die. Ms. Pommier explained that Mr. Lege was in a lot of pain for which he took opioids and that he suffered from depression. Ms. Pommier further explained that Mr. Lege struggled to breathe, needed oxygen, had trouble sleeping, coughed a lot, was mostly confined to his bed, and was weak, which caused him to fall often. Ms. Pommier testified that she had to give Mr. Lege more and more pain medication to

7

manage his pain as time progressed to get Mr. Lege to "an acceptable level of pain."

Ms. Pommier testified that Mr. Lege was the leader of his family and was a tough man, so he was very distressed about losing his independence and was scared about dying. Mr. Lege suffered from hallucinations for which he had to be prescribed an anti-psychotic medication. She testified that Mrs. Lege particularly struggled at the end of Mr. Lege's life as Mrs. Lege had her own health issues and was acting as Mr. Lege's main caregiver. Ms. Pommier recounted that Mrs. Lege discussed with her some of Mrs. Lege's fear and anguish over losing her husband.

*Brenda Lege*

Brenda Lege, Mr. Lege's wife, testified that she and Mr. Lege married when she was 17 and he was 21 and were married for 49 years. They had four children together, eight grandchildren, and nine great-grandchildren. She testified that, before he got sick, he would spend his days going to casinos, taking care of his animals, and watching soap operas. Mrs. Lege recounted that Mr. Lege began experiencing shortness of breath in 2013, and she took Mr. Lege to get a chest x-ray. Mr. Lege had to have two liters of fluid drained from his lungs.

Mrs. Lege testified that Mr. Lege was diagnosed with mesothelioma on his birthday in 2016. Mr. Lege tried chemotherapy, which was difficult because he was afraid of needles. The chemotherapy was unsuccessful and he was sent to hospice care. Mrs. Lege recounted that it was hard for Mr. Lege to accept that his condition was fatal.

Mrs. Lege testified that Mr. Lege had a "fine" relationship with his children, grandchildren, and great-grandchildren, and that they were always doing family things together. She testified he was proud of his children and grandchildren. Mrs.

Lege stated that, in the last couple of weeks of his life, Mr. Lege could barely talk and could not eat, but would only ask for morphine as a last resort when the pain became too severe.

*Bridgette Lege Stelly and Tyler Lege*

Although all four of Mr. Lege's children were present at the trial, only two of his children—Bridgette and Tyler—testified. Tyler testified that he was speaking on behalf of himself and his brother, Rodney. Tyler explained that he spent most of his time growing up with his dad, that they went hunting and fishing together, and did everything together, calling Mr. Lege his best friend. He testified that he probably did more with his dad than with his friends. Tyler explained that his parents helped raise his daughter.

Tyler testified that Mr. Lege took care of everyone and was the one who made everyone happy. He explained that Mr. Lege was a dad for his friends as well. He testified that he and his siblings would often call him "T" and that he cooked every weekend and had parties. Tyler stated that Mr. Lege was full of life. Tyler said that his father was more of a friend to him and that, after living and working in Africa for seven years, he moved home to spend the last two months of Mr. Lege's life with him. He testified he lived next door to his dad and that he basically stayed in his parents' outdoor kitchen. Tyler explained that his whole family was always together.

Bridgette testified on behalf of herself and her sister. She testified that Mr. Lege had an extraordinary relationship with her mom and that he spent a great deal of time outdoors. She said that she saw her dad four or five times a week until he passed away, including eating and playing cards together on Saturdays when her dad would cook. She testified that she and her entire family were always camping

and that Mr. Lege would often cook or barbecue for the family. Bridgette recounted that her father and the rest of her family were always taking vacations together every year. She testified that Mr. Lege acted as though he could never spend enough time with her, her siblings, and his grandchildren. She also stated that she went with him to his doctor's appointments and was there when hospice came. She testified that she observed him struggling to breathe and that she wished he had had more time on earth to spend with their family.

**BIRLA'S CASE-IN-CHIEF**

During its case-in-chief, Birla presented the testimony of Donald Comeaux, who worked for The Cajun Company as well as its own expert industrial hygienist, Laurence Durio.

*Donald Comeaux*

Mr. Comeaux testified he worked for Cajun Company doing mainly insulation, but testified he never removed insulation while working for Cajun, nor did he see any other Cajun employees removing insulation. Mr. Comeaux also stated that the insulation materials were already at the plant when the employees arrived, and that Cajun did not provide the workers with the source of the material. On cross-examination, Mr. Comeaux admitted he did not work with Mr. Lege at the Columbian plant. He testified that he did not know there was asbestos in the plant.

*Laurence Durio*

Mr. Durio was accepted by the trial court an expert industrial hygienist. Mr. Durio recalled Mr. Lege's testimony that he worked briefly at the Columbian plant. He testified that he did not believe Mr. Lege's job would have required him to touch or do anything with the insulation at the plant. He admitted that Cajun, Mr.

Lege's employer, had a define-scope contract with Columbian where it would ask Cajun to send workers like Mr. Lege to complete a job. Mr. Durio explained that in defined-scope contracts, once the job was completed, the contract was finished.

**JURY'S DELIBERATIONS**

Following closing arguments, the jury retired to deliberate. During deliberations, the jury sent the following question: "Does 51 percent preponderance of the evidence apply to the percentage of fault for the wrongful death?" The trial court stated: "We consulted with counsel on both sides, who agree that, number one, the jury should be asked which specific question they were referring to and, number two, could they be more specific in their question." Both parties' counsel agreed on the record that the trial court's statement was correct. The jury then sent another question, saying: "Regarding Question No. 8, if we assign less than 51 percent to Colombian Chemicals of fault, will that make the plaintiffs lose?" The trial court responded that "[a]fter consultation, counsel agreed to send the following response, which was handwritten on the same paper that the jurors used for the second question. The response read: 'No. Assign whatever percentages you think are appropriate.'" Counsel for both parties again noted on the record that the trial court's answer was the agreed-upon response.

**THE VERDICT**

At the conclusion of trial, the jury found: (1) Birla fifty-one percent at fault; (2) The Cajun Company twenty percent at fault; (3) The Cabot Company, Texaco, Thermotech, Dresser/Brown & Root, and Ohlson each five percent at fault; and (4) Owens-Corning Kaylo, Johnsmansville Thermobestos, UNARCO Unibestos, and Eagle-Picher 66 Insulating Mud each one percent at fault. The jury awarded total damages in the amount of $8,214,479.35, awarding: (1) $4 million in the survival

action for Mr. Lege's pain and suffering; (2) $2 million to Mrs. Lege in the wrongful death action; (3) $500,000 to each of Mr. Lege's four adult children in the wrongful death action; (4) medical expenses in the amount of $198,405.06; and (5) funeral expenses in the amount of $16,074.29. Based on the fifty-one percent of fault apportioned to Birla, Birla was ordered to pay $1,399,468.35 in the survival action: $1,028,197.89 to Mrs. Lege; and $255,000 to each of Mr. Lege's four adult children, all with interest.

The trial court adopted the jury's verdict and rendered judgment on November 5, 2019. Thereafter, on November 15, 2019, Birla filed a motion for new trial, which the trial court denied on February 5, 2020. From this judgment, Birla timely appeals.

## DISCUSSION

### *Assignments of Error*

On appeal, Birla assigns five errors:

(1) Because the pre-trial deposition testimonies of Mr. Lege and that of his treating physician Dr. Raybon were not made part of the trial record, this Court is unable to affirm the trial court's judgment because we cannot determine if the Leges met their burden of proof as to causation;

(2) The jury improperly disregarded the trial court's instructions and conflated the principles on fault allocation and burden of proof;

(3) The allocation of fault to Birla and the monetary awards are excessive based on the record and should be reduced;

(4) Alternatively, the jury manifestly erred in its allocation of fault and damage award; and

(5) The trial court erred in requiring Birla to produce evidence of Taylor-Seidenbach's fault in order for Birla to gain credit for Taylor-Seidenbach's virile share of the damage award.

We discuss each assignment of error in turn.

### *Assignment of Error No. 1 – No Record Evidence of Mr. Lege Working at Birla Facility*

In its first assignment of error, Birla contends that the record does not include a transcript of Mr. Lege's deposition testimony taken prior to his death, wherein he stated he worked for a time at the Columbian facility where he was exposed to asbestos. Although Birla admits this testimony was played for the jury and does not dispute that Mr. Lege testified that he worked at the plant, Birla, nevertheless, argues that, because the deposition transcripts are not in the record, this Court cannot affirm the trial court's judgment because the record contains no other evidence that Mr. Lege worked at the Columbian facility. Thus, Birla argues, the Leges did not meet their burden of proof as to causation.

The Leges admit that the pre-trial depositions of Mr. Lege and his treating physician Dr. Raybon that were played for the jury were not originally included in the record lodged in this Court. The Leges counter, however, that because Birla referred to this testimony throughout the trial as indicated in the record, it amounts to a judicial confession under La. C.C. art. 1853.[2]

---

[2] La. C.C.P. art. 1853 provides:

> A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it.
>
> A judicial confession is indivisible and it may be revoked only on the ground of error of fact.

Much litigation ensued both at the trial court and before this Court due to the missing depositions. As a result, on January 11, 2021, pursuant to this Court's authority under La. C.C.P. art. 2132,[3] this Court ordered the Leges to supplement the record herein with the redacted transcript of Mr. Lege accurately reflecting what was played for the jury and the transcript of Dr. Raybon. Thereafter, on January 13, 2021, this Court also ordered the Leges to produce the video depositions of Mr. Lege and Dr. Raybon as they were played for the jury and further ordered Birla to file any objections it may have to the production of the video depositions in writing with this Court.

On January 25, 2021, the Leges supplemented the record with the redacted transcripts as well as the video depositions as ordered, representing to this Court that they were certain the jury heard the testimony they submitted. On January 28, 2021, Birla filed its opposition. Birla argued that the supplement should not be considered by this Court, contending that the Leges were attempting to reconstruct which portions of Mr. Lege's deposition testimony and that of Dr. Raybon were played for the jury after the fact. Birla maintains the supplement is not reliable, pointing to inconsistencies between what counsel for Mr. Lege represented was played for the jury and what was submitted as part of the supplement to the record—*i.e.* that counsel for the Leges insisted Dr. Raybon's whole deposition testimony was played, but submitted a redacted version of the testimony. Birla contends there are inconsistencies in the portions of the transcripts that were

---

[3] La. C.C.P. art. 2132 provides:

> A record on appeal which is incorrect or contains misstatements, irregularities or informalities, or which omits a material part of the trial record, may be corrected even after the record is transmitted to the appellate court, by the parties by stipulation, by the trial court or by the order of the appellate court. All other questions as to the content and form of the record shall be presented to the appellate court.

submitted by the Leges of Mr. Lege's pre-trial deposition testimony when compared to the video submission, as well.

This Court notes that, the alleged inconsistencies Birla points out in its objection aside, Birla has not argued at any point that the jury did not hear Mr. Lege's pretrial deposition testimony, wherein he stated he worked at the Columbian plant occasionally over a four-month period. Thus, there is no dispute that Mr. Lege's testimony about working at the Columbian plant was presented to the jury, even if there is a dispute about whether other portions of Mr. Lege's testimony were presented. Accordingly, we find that the record before this Court is adequate, and we can review the assigned errors.

Moreover, this Court is able to look to other testimony in the record to determine if causation was met. Both parties' expert industrial hygienists, Mr. Parker and Mr. Durio, testified about Mr. Lege's testimony. Mr. Parker was specifically asked by Birla during cross-examination about Mr. Lege's testimony that he worked at the Columbian plant, and Mr. Parker referenced this testimony when he detailed the amount of asbestos to which Mr. Lege would have been exposed at the Columbian plant, even if Mr. Lege only worked there occasionally for a short time.

Additionally, Mr. Durio testified regarding Mr. Lege's work at the Columbian plant when he opined that Mr. Lege would not have needed to interact with materials that contained asbestos when he worked at the plant. Mr. Durio also referenced his knowledge of Columbian's limited-scope contract with Mr. Lege's employer wherein Mr. Lege's employer agreed to send workers to the Columbian plant on an as-needed basis to perform certain jobs that were limited in scope. This

15

corroborates the testimony that Mr. Lege was sent to work at the Columbian plant occasionally.

We also look to the pleadings in the record, specifically those filed by Birla, wherein it admits that Mr. Lege testified he worked at the Columbian plant at trial through his pre-trial deposition testimony, and that this deposition was played for the jury. In its motion for new trial, Birla conceded that Mr. Lege testified he worked at the Columbian plant and that the jury heard that testimony. Birla admitted that Mr. Lege indeed testified that, in 1979, he was assigned by his then-employer Cajun Insulation to do work at the carbon black plant owned by Cabot Corporation and that, occasionally, he was sent to work at the Columbian plant across the street, as well.

"[T]he signature of an attorney or party [on a pleading] shall constitute a certification by him that he has read the pleading, and that to the best of his knowledge, information, and belief formed after reasonable inquiry, he certifies…[e]ach allegation or other factual assertion in the pleading has evidentiary support." La. C.C.P. art. 863(B)(3).

By signing its motion for new trial, Birla certified that the statements contained therein were supported by evidence to the best of its knowledge, information, and belief. Accordingly, Birla conceded in its motion for new trial that Mr. Lege testified that he worked at the Columbian plant and that the jury heard this testimony during trial. It is, therefore, disingenuous for Birla to now claim there is no evidentiary support for the jury's finding that Mr. Lege worked at the Columbian plant when Birla previously conceded that there was.

Further, Birla's statements in its motion for new trial, in addition to its statements throughout the trial referring to Mr. Lege's testimony that he

16

occasionally worked at the Columbian plant, as well the testimony of Mr. Parker and Mr. Durio referring to Mr. Lege saying he worked at the Columbian plant, amount to a judicial confession. A judicial confession "is a declaration made by a party in a judicial proceeding" which "constitutes full proof against the party who made it." La. C.C.P. art. 1853. The Louisiana Supreme Court has explained that "[a] judicial confession is a party's explicit admission of an adverse factual element and has the effect of waiving evidence as to the subject of the admission— of withdrawing the subject matter of the confession from issue." *Cichirillo v. Avondale Indus., Inc.*, 2004-2894, p. 6 (La. 11/29/05), 917 So.2d 424, 429 (citing *Cheatham v. City of New Orleans*, 378 So.2d 369, 375 (La. 1979); *Sutton's Steel & Supply, Inc. v. Bellsouth Mobility, Inc.*, 2000-0511, p. 4 (La. App. 3 Cir. 12/13/00), 776 So.2d 589, 592. Statements by counsel during a judicial proceeding can be considered a judicial confession. *Id.*, 2004-2894, p. 8, 917 So.2d at 430. *See also Fed. Work Ready, Inc. v. Wright*, 2019-0752, p. 16 (La. App. 4 Cir. 4/22/20), 299 So.3d 140, 150.

We conclude that Birla has judicially confessed that Mr. Lege stated he worked at the Columbian plant and that the jury heard that testimony. The record is clear that this testimony was presented to the jury because both Mr. Lege's expert Mr. Parker and Birla's expert Mr. Durio referenced these statements in their own testimony. Thus, we reject Birla's contention that the lack of the transcribed testimony necessarily means that this matter must be remanded for a new trial. "[A]n incomplete record may nonetheless be adequate for appellate review." *State v. Castleberry*, 1998-1388, p. 29 (La. 4/13/99), 758 So.2d 749, 773 (citing *State v. Hawkins*, 1996-0766 (La. 1/14/97), 688 So.2d 473). A party is not entitled to relief absent a showing of prejudice based on the missing portions of the transcripts.

*Castleberry*, 1998-1388, p. 29, 758 So.2d at 773. Birla has not articulated prejudice due to the missing transcript of Mr. Lege's testimony, and this Court declines to remand for a new trial on this basis.

***Assignment of Error No. 2 – Jury Instructions***

In its second assignment of error, Birla contends that the jury either ignored the trial court's instructions regarding the preponderance of the evidence standard of proof and the allocation of fault or conflated the two concepts. Birla essentially argues that this is obvious because the jury assigned the "odd" number of fifty-one percent of the fault to Birla after asking the trial court whether assigning less than fifty percent of fault to Birla would cause Mr. Lege to "lose." Birla also contends that this case is similar to this Court's recent decision in *Bagwell v. Union Carbide Corp.*, 2019-0414, 2020 WL 5651699, *4 (La. App. 4 Cir. 9/23/20), *writ granted, judgment rev'd*, 2020-01242 (La. 1/12/21), 308 So.3d 289,[4] wherein this Court, on rehearing, vacated the jury's verdict and remanded the matter for new trial because the jury's answers to interrogatories were inconsistent and irreconcilable with the findings of fact.

In the instant case, the record shows that, during the deliberations, the jury sent a question to the trial court asking if the fifty-one percent preponderance of the evidence applied to the percentage of fault for the wrongful death. After consulting with counsel for both Birla and the Leges, the trial court asked the jury

---

[4] We note that, in its *per curiam*, the Louisiana Supreme Court reversed this Court's decision on rehearing in *Bagwell* and reinstated this Court's original ruling, finding that the jury's answers to interrogatories were not inconsistent and irreconcilable with the findings of fact. *Id.*, 2020-01242, p. 3, 308 So.3d at 290. Despite Birla's reliance on *Bagwell*, and especially in light of the Supreme Court's decision, we find *Bagwell* inapplicable to this case, as this case did not involve allegedly irreconcilable jury interrogatories and findings of fact. Although Birla may dispute the propriety of the jury's allocation of fault, the record establishes that the jury found Birla (and its co-defendants) at fault and apportioned fault as it saw fit. Birla has not argued that the jury's findings of fact are irreconcilable with its answers to interrogatories.

18

to be more specific in its question. The jury sent another question, which said: "Regarding Question No. 8, if we assign less than 51% to Colombian Chemicals of fault, will that make the plaintiffs lose?" The trial court again consulted with counsel for both parties and responded to the jury's question with "No. Assign whatever percentages you think are appropriate." The record is clear that counsel for Birla, along with the Leges' counsel, confirmed that this was the response all parties agreed upon.

"[I]t must be presumed that the jury followed the instructions of the trial judge." *State v. Labat*, 226 La. 201, 223, 75 So.2d 333, 341 (1954)(citations omitted). Further, this Court has stated: "[w]e presume the jury followed the court's instructions…" *Shepard v. State Farm Mut. Auto. Ins. Co.*, 545 So.2d 624, 627 (La. App. 4 Cir. 1989). Other than argument regarding the amount of fault the jury apportioned to Birla, Birla has pointed to nothing which overcomes this presumption.

Further, Birla cannot complain of the instruction the trial court gave in response to the jury's question because it failed to timely object to the instruction. *See* La. C.C.P. art. 1793(C) ("A party may not assign as error the giving or the failure to give an instruction unless he objects thereto either before the jury retires to consider its verdict or immediately after the jury retires, stating specifically the matter to which he objects and the grounds of his objection."); *Berrera v. Hyundai Motor Am. Corp.*, 620 So.2d 890, 893 (La. App. 4 Cir. 1993)(citations omitted)("A party's failure to timely object, for the record, with specificity, constitutes a waiver of the objection."). Indeed, the record reflects that the trial court consulted with all parties, including Birla, on how best to answer the jury's question. The record further reflects that Birla participated in drafting the trial court's response to the

19

jury's question and did not object to the trial court's response when it was sent to the jury. Thus, Birla has waived the ability to assign the instruction as error.

***Assignment of Error No. 3 – Allocation of Fault***

In its third assignment of error, Birla argues that the jury's allocation of fault is excessive and should be reduced because of the limited evidence that Mr. Lege spent a short time in the Columbian facility in comparison to the time he spent in the employ or at the facilities of the other defendants. Birla contends the jury should have, at most, allocated five percent of fault to Birla, as it did for other similarly-situated defendants.

A jury's allocation of fault is reviewed under the manifest error standard of review. *Watson v. Hicks*, 2015-0046, p. 7 (La. App. 4 Cir. 5/27/15), 172 So.3d 655, 663 (citing *Ardoin v. Firestone Polymers, L.L.C.*, 10-0245 at p. 6 (La.1/19/11), 56 So.3d 215, 219). Appellate courts are required to give great deference to the trial court's allocation of fault and "[o]nly after making a determination that the trier of fact's apportionment of fault is clearly wrong can an appellate court disturb the award." *Id.*, 2015-0046, p. 7, 172 So.3d at 664 (quoting *Fontenot v. Patterson Ins.*, 2009-0669, p. 22 (La. 10/20/09), 23 So.3d 259, 274)(internal citations omitted).

Based on a review of the record, the jury's allocation of fault is not manifestly erroneous. The record is replete with evidence that a great amount of asbestos was present in the Columbian plant, both before Mr. Lege worked there and after. Mr. Parker, the Leges' expert industrial hygienist, testified that when the Columbian facility was abated of asbestos in the 1980s, 77 tons of asbestos were removed. Additionally, Mr. Parker testified that the type of asbestos that was removed would have exposed someone to as much as 2,500 times the tolerable level of asbestos exposure. Evidence at trial also supports a finding that Birla did

not meet its duty to inform employers who sent their employees to work in the facility that asbestos was on the premises, as required by OSHA. The record also shows that there were other "willful" violations by Birla for which it was cited by OSHA, with regard to possible asbestos exposure and the failure to warn workers.

Birla's argument that the allocation of fault is necessarily excessive due to the relative short amount of time Mr. Lege worked in the Columbian plant versus when he worked for or in the plants of the other defendants is unpersuasive. As this Court articulated in *Oddo v. Asbestos Corp. Ltd.*, 2014-0004, pp. 10-11 (La. App. 4 Cir. 8/20/15), 173 So.3d 1192, 1202:

> The applicable law in asbestos cases is well-settled. To prove liability of a manufacturer or professional vendor of an asbestos-containing product, the plaintiff must show "he had sufficient exposure to the product complained of to the extent that it was a substantial factor in bringing about his injury." *Rando v. Anco Insulations, Inc.*, 2008-1163, 2008-1169, p. 35 (La. 5/22/09), 16 So.3d 1065, 1091 (citing *Asbestos v. Bordelon, Inc.*, 1996-0525, p. 30 (La. App. 4 Cir. 10/21/98), 726 So.2d 926, 948; *Vodanovich v. A.P. Green Industries, Inc.*, 2003-1079, p. 4 (La. App. 4 Cir. 3/3/04), 869 So.2d 930, 933). This standard of proof, developed by Louisiana courts over years of asbestos litigation, is known as the "substantial factor" test. *Id.* Stated differently, the plaintiff must prove, by a preponderance of the evidence that: (1) his exposure to the defendant's asbestos product was significant; and (2) that this exposure caused or was a substantial factor in bringing about his mesothelioma (or other asbestos-related disease). *Robertson v. Doug Ashy Bldg. Materials, Inc.*, 2010-1551, p. 19 (La. App. 1 Cir. 10/4/11), 77 So.3d 360, 372 (citing *Rando*, 2008-1163, 2008-1169, p. 38, 16 So.3d at 1092).

Birla's argument ignores the well-settled precedent that the relevant consideration is not the length of the exposure, but rather whether the evidence established "significant exposure to the asbestos-containing product complained of to the extent that it was a substantial factor in bringing about [the] injury." *Rando*, 2008-1163, p. 35, 16 So.3d at 1091.

21

Mr. Parker characterized Mr. Lege's work at the Columbian plant as being "very physical" and "chesty" work. Mr. Parker explained that this meant Mr. Lege would have been breathing very fast while working in the plant, causing him to inhale even more asbestos fibers. We consider this along with Mr. Parker's testimony that 77 tons of asbestos was removed from the plant in the 1980s after Mr. Lege worked there and Mr. Parker's testimony that Mr. Lege could have inhaled as much as a year's worth of asbestos exposure in a single day's work at the Columbian plant. We find this evidence supports the conclusion that Mr. Lege's work at the Columbian plant—though short in duration—was a substantial factor in bringing about his mesothelioma. This assignment of error lacks merit.

### *Assignment of Error No. 4 – Assessment of Damages*

In its fourth assignment of error, Birla argues that, given Mr. Lege's relatively short amount of suffering and the lack of evidence produced at trial regarding his relationships with his wife and children, the survival and wrongful death damages should be reduced. Birla contends that the jury's award of $4 million to Mr. Lege for the survival action, and $2 million for the wrongful death action to Mrs. Lege, along with $500,000 to each of the four adult children, was excessive. Birla argues that, when examined against awards for similar injuries and suffering, the survival damages awarded to Mr. Lege are excessive. Birla also argues that the wrongful death damages awarded to Mrs. Lege and Mr. Lege's children are excessive because only two of the four children testified, no evidence was offered about his relationship with the two non-testifying children, and the evidence showed that, though Mr. Lege and is wife were married for 49 years, they lived relatively separate lives.

In considering the award of damages for the wrongful death and survival action, we are mindful that "[a]lthough both actions arise from a common tort, survival and wrongful death actions are separate and distinct." *White v. Entergy Gulf States Louisiana, L.L.C.*, 2013-1608, p. 6 (La. App. 1 Cir. 11/10/14), 167 So.3d 764, 769. "The survival action comes into existence simultaneously with the existence of the tort and is transmitted to beneficiaries upon the victim's death." *Id.* "The survival action permits recovery only for the damages suffered by the victim from the time of injury to the moment of death. It is in the nature of a succession right." *Id.* "On the other hand, the wrongful death action does not arise until the victim dies, and it compensates the beneficiaries for their own injuries, which they suffer from the moment of the victim's death and thereafter." *Id.* (citing La. C.C. arts. 2315.1 and 2315.2); *McGee v. A C And S, Inc.*, 2005-1036 (La. 7/10/06), 933 So.2d 770, 779-80 (internal citation omitted). "In addition, a wrongful death claim is like a loss of consortium claim insofar as it clearly compensates the beneficiaries for their own injuries, separate and distinct from the primary victim's injuries." *Id.* (citing *McGee*, 933 So.2d at 780) (internal citation omitted).

### Survival Action Damages

We look first at the jury's $4 million damage award for Mr. Lege's pain and suffering. La. C.C. art. 2315.1 grants a decedent's family the right to file a survival action and "the right to recover all damages for injury to that person, his property or otherwise, caused by the offense or quasi offense…"

General damages, which are "speculative in nature and cannot be fixed with mathematical certainty," involve: mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or life-style which cannot be definitely measured in monetary terms.

*Waters v. Oliver*, 2016-1262, p. 18 (La. App. 4 Cir. 6/22/17), 223 So.3d 37, 49 (citations omitted).

"The factors to be considered in assessing quantum for pain and suffering are severity and duration." *Antippas v. Nola Hotel Grp., LLC*, 2017-0798, p. 15 (La. App. 4 Cir. 2/27/19), 265 So.3d 1212, 1222 (citing *Simon v. Reel*, 2003-0932, p. 6 (La. App. 3 Cir. 3/3/04), 867 So.2d 174, 178-79). General damage awards are reviewed under an abuse of discretion standard because the trier of fact is in the best position to evaluate witness credibility and see the evidence firsthand. *Antippas*, 2017-0798, pp. 15-16, 265 So.3d at 1222-23 (citation omitted). "An appellate court may not overturn an award for general damages unless it is so out of proportion to the injury that it shocks the conscience." *Id*. 2017-0798, p. 16, 265 So.3d at 1223 (quoting *Lee v. Lu*, 2005-899, p. 9 (La. App. 5 Cir. 4/11/06), 931 So.2d 365, 371).

"It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." *Youn v. Maritime Overseas Corp.*, 623 So.2d 1257, 1261 (La. 1993). The Louisiana Supreme Court has clarified that, "[o]nly after such a determination of an abuse of discretion is resort to prior awards appropriate and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion." *Id*., 623 So.2d at 1260-61 (citing *Coco v. Winston Industries, Inc.*, 341 So.2d 332 (La. 1976)).

The evidence presented at trial showed that Mr. Lege began experiencing shortness of breath in 2013, which continued until he sought treatment in 2015. Mrs. Lege testified that, prior to being diagnosed, he had over two liters of fluid

24

drained from his lungs twice. He also underwent chemotherapy for a while, which proved to be unsuccessful. While he did not undergo any other surgeries due to mesothelioma, following the unsuccessful round of chemotherapy, Mr. Lege's condition was determined to be incurable. Mr. Lege was then admitted to hospice care in December 2016, before he passed away in March 2017, two years after his diagnosis.

According to the testimony of Mrs. Lege, Ms. Pommier, and Bridgette, in the last four months of his life, he was mostly confined to his bed, and eventually got to the point that he could not eat or speak. Both of Mr. Lege's children, Tyler and Bridgette, described Mr. Lege as the leader of his family who was always taking care of everyone. Ms. Pommier, Mr. Lege's hospice nurse, testified that Mr. Lege's pain had to be controlled, but never fully resolved, using strong pain medication, and that he suffered from delusions, which necessitated his being given anti-psychotic medication. Dr. Raybon confirmed that mesothelioma, as a cancer, invades the body and is very painful. Dr. Raybon testified that, not only was chemotherapy not beneficial to Mr. Lege, but it took a negative physical toll on Mr. Lege, as well. Dr. Raybon further stated that, in Mr. Lege's case, mesothelioma caused breathing difficulty until, eventually, Mr. Lege had lung failure.

Ms. Pommier described Mr. Lege as a tough man who struggled with his impending death, leading to him suffering from depression. Mrs. Lege testified that, although he was in a great deal of pain, Mr. Lege would only ask for pain medication as a last resort and that Mr. Lege was quite distressed at not being able to maintain his independence or continue the role of being head of his family. Before his death, Mr. Lege could not eat, speak, or breathe.

25

We contrast the facts of this case with the First Circuit's decision in *White*, 2013-1608, 167 So.3d 764. In *White*, the First Circuit upheld the jury's $3.8 million award to a plaintiff who was diagnosed with mesothelioma and died six weeks following his diagnosis. *Id.*, 2013-1608, p. 8, 167 So.3d at 770. The First Circuit noted that the plaintiff suffered for a relatively short period of time following his diagnosis, and underwent unsuccessful chemotherapy and fluid draining procedures before being placed into hospice care where his pain was mostly managed. *Id.*, 2013-1608, p. 11, 167 So.3d at 772. The First Circuit found that it could not conclude that the trial court abused its vast discretion in making its damage award. *Id.*

We also compare this case to another First Circuit decision in *Terrance v. Dow Chem. Co.*, 2006-2234, p. 3 (La. App. 1 Cir. 9/14/07), 971 So.2d 1058, 1061-62, wherein the plaintiff, who was diagnosed with mesothelioma in September 2001 after working for a number of years in oil and gas refineries, died four months after his diagnosis in January 2002. In upholding the jury's $5 million total damages award, the First Circuit noted that the plaintiff in *Terrance* "suffered incredible pain and numerous hospitalizations, painful procedures, nausea, severe weight loss, and fatigue in the few months between his diagnosis and death," as well as "a severe cough, shortness of breath, and pain." *Id.*, 2006-2234, p. 21, 971 So.2d at 1071. Similar to Mr. Lege, the plaintiff In *Terrance* suffered from depression prior to his death and was involved in numerous outdoor activities and in attending and hosting family events. *Id.*, 2006-2234, p. 22, 971So.2d at 1071.

In comparing this case to *Terrance* and *White*, we note that Mr. Lege suffered for two years following his diagnosis compared to the six-week post-diagnosis suffering of the plaintiff in *White* and the four-month post-diagnosis

26

suffering of the plaintiff in *Terrance*. During those two years, the record shows that Mr. Lege also underwent unsuccessful chemotherapy treatment and fluid-draining treatments before being admitted to hospice care four months before his death where he was in great pain, was suffering from depression and delusions. Based on the record, we do not find that the jury abused its discretion in awarding damages to Mr. Lege.

## Wrongful Death Damages

Next, we consider the jury's $2 million award to Mrs. Lege and $500,000 to each of Mr. Lege's adult children in the wrongful death action, which Birla also argues should be reduced.

A decedent's family may file a wrongful death action if the decedent's death is caused by the negligence of another. La. C.C. art. 2315.2. The trier of fact is given "much discretion" in its assessment of damages. La. C.C. art. 2324.1. "Therefore, the damage amount is 'entitled to great deference on review.'" *Chaisson v. Avondale Indus., Inc.*, 2005-1511, p. 40 (La. App. 4 Cir. 12/20/06), 947 So.2d 171, 197 (quoting *Trunk v. Med. Ctr. of La. at New Orleans*, 2004-0181, p. 9 (La. 10/19/04), 885 So.2d 534, 539)(internal citations omitted). "Accordingly, appellate courts review general damage awards using the abuse of discretion standard." *Id*. (citing *Youn*, 623 So.2d 1257, 1260 (La. 1993)). "The elements used to assess wrongful death awards include 'loss of love and affection, loss of services, and loss of support.'" *Id*. (quoting *Turner v. Lyons*, 2003-0186, pp. 11-12 (La. App. 4 Cir. 1/28/04), 867 So.2d 13, 21). "[B]efore a trial court award of damages can be questioned as excessive or inadequate, the reviewing court must look first, not to prior awards, but to the individual circumstances of the instant case." *Turner*, 2003-0186, p. 12, 867 So.2d at 22 (internal citation omitted).

27

Louisiana courts "have given the greatest weight to cases involving surviving spouses with long, stable, and happy marriages, and to those involving adult children who had very close and positive relationships with their parent." *Moss v. State*, 2007-1686, p. 24 (La. App. 1 Cir. 8/8/08), 993 So.2d 687, 706. In reviewing damage awards to children in a wrongful death action, the reviewing court must look to "the circumstances of the relationship of *each* child with the decedent." *Turner*, 2003-0186, p. 12, 867 So.2d at 22 (emphasis in original) (citation omitted).

*Award to Mrs. Lege*

Mrs. Lege testified that she and Mr. Lege were married just shy of 50 years, having married when she was 17 and he was 21. From that marriage, four children were born, and in turn, numerous grandchildren and great-grandchildren were born. She also testified that their family was close and that they were always doing things together. Bridgette testified about the strong relationship Mrs. Lege had with her father, calling their relationship "extraordinary." Mrs. Lege explained that she was active in caring for Mr. Lege in his final days. This testimony is bolstered by the testimony of Ms. Pommier, who said Mrs. Lege was with Mr. Lege until the end of his life and that Mrs. Lege discussed some of her fear and anguish over her husband's impending death with Ms. Pommier.

Based on the record, Mr. and Mrs. Lege had a long and stable marriage. Additionally, Mrs. Lege demonstrated her claim for loss of love, support, and services, as the record shows that Mr. Lege was usually the one who did the cooking in the family and that Mrs. Lege, who suffered from her own health problems, lost Mr. Lege's support toward the end of her life. We do not find that

the trial court abused its discretion in awarding damages to Mrs. Lege, and affirm the award.

*Award to the Testifying Children, Tyler and Bridgette*

As to Mr. Lege's children, Birla argues that the award is excessive given the evidence presented at trial. Birla notes that only two of the four children testified and they provided no testimony as to the relationship Mr. Lege had with the other two children aside from "general" testimony. Birla further argues that Mr. Lege's son Tyler, who did testify at trial, lived in Africa for several years prior to his father's death, only coming home for the last two months of Mr. Lege's life.

A review of the record indicates that the awards to Bridgette and Tyler are not an abuse of discretion. Bridgette testified that she attended all of her father's doctor's appointments and assisted in his care. She also testified that she saw her father at least four times a week, and would often play cards with him, eat meals with him, and go on vacations with him and the rest of the family. Bridgette also testified that she wished Mr. Lege had more time on earth to spend with her and their family.

Similarly, Tyler called Mr. Lege his best friend and testified that he and his father had a close relationship where they hunted and fished together. He testified that he spent more time with Mr. Lege than with his other friends. He also testified that, once he returned from Africa, he moved next door to his parents and saw them often, basically living in their outdoor kitchen. There is nothing in the record that supports a finding that Tyler living in Africa was the result of or negatively impacted his relationship with Mr. Lege. Tyler and Bridgette also testified that Mr. Lege was the one in their family who took care of everyone and that he shared a

close relationship with each of his children, grandchildren, and great-grandchildren.

This testimony demonstrates the close and positive relationship Tyler and Bridgette each had with their father. Their testimony was not general; they each articulated a specific, personal loss. Tyler testified that he lost someone he considered a best friend, and Bridgette wished Mr. Lege would have lived longer so she could spend more time with him and testified that she lost someone whom she spent time caring for and with whom she spent time socializing. Accordingly, we find that the award to Bridgette and Tyler was not an abuse of discretion.

*Award to the Non-Testifying Children, Kristina and Rodney*

Turning to the award to Mr. Lege's other two children, Kristina and Rodney, we note that the testimony established that Mr. Lege was beloved by his family. This Court, however, is a court of record. *Turner*, 2003-0186, p. 14, 867 So.2d at 22. Accordingly, "[i]n assessing whether the trial court abused its discretion in awarding [damages to the decedent's children] … we must review the evidence of record in this case showing that the children had such extraordinary demands on them as to establish an award for loss of consortium…." *Id*., 2003-0186, p. 14, 867 So.2d at 22-13.

In *Turner*, this Court discussed a similar trial record where, although the decedent's adult children demonstrated that they suffered a measurable and compensable loss, the record only contained "general testimony" that did not support the damages awarded to each individual child. *Id.*, 2003-1086, pp. 16-17, 867 So.2d at 24. This Court particularly noted that in *Turner*, as here, only two of the defendant's children testified. We noted that "[b]ecause loss of consortium is a personal loss, each child should be given a chance to convey the impact the injury

or death had on their respective lives." *Id.*, 2003-0186, p. 17, 867 So.2d at 25. The Court noted that the children who testified established the impact the decedent's death had on their family, but the testimony particularly established the impact the decedent's death had personally on the children who testified. *Id.*

Keeping these principles in mind, we find that the awards to Kristina and Rodney were an abuse of discretion. Although Tyler and Bridgette testified that they were testifying on behalf of their other two siblings because they did not want to take up too much of the jury's time and that both siblings were present in court during the trial, the record contains no specific testimony about Mr. Lege's relationship with them. Bridgette and Tyler only gave general testimony that their family was always together. The record does not support the award to Kristina and Rodney.

Having determined that the jury's award to Kristina and Rodney was an abuse of discretion, we look to prior awards to determine the highest point that is reasonably within the jury's discretion based on the record. *See Youn*, 623 So.2d at 1260-61. A review of applicable jurisprudence shows that awards to adult children for the death of an elderly parent ranges from $12,500 to $150,000.

In *Turner*, this Court reduced $150,000 awards to $50,000 for the adult children that testified at trial and reduced the award to $20,000 for non-testifying adult children. *Id.*, 2003-0186, p. 19, 867 So.2d at 25-26.

In *Brodtmann v. Duke*, 1996-0257, p. 22 (La. App. 4 Cir. 2/11/98), 708 So.2d 447, 460, this Court affirmed a $150,000 award to the decedent's adult children—though we noted that it was on the high end of the spectrum—because the trial court found that the family was very close and relied upon the decedent as a "great source of emotional support."

31

In *Vedros v. Pub. Grain Elevator of N.O., Inc.*, 1994-0659 (La. App. 4 Cir. 4/13/95), 654 So.2d 775, 781, although this Court noted that the award was less than what it would have awarded based on the record, this Court upheld a $12,500 award to the adult children of a sixty-seven year old decedent, where both children testified they spoke with the decedent every day and relied upon the decedent for advice and friendship.

In *Norfleet v. Lifeguard Transp. Serv., Inc.*, 2005-0501, p. 13 (La. App. 4 Cir. 5/17/06), 934 So.2d 846, 856, this Court found that the jury committed legal error in not awarding the adult children of the decedent wrongful death damages, "[c]onsidering the extreme closeness of the … family, … and their reliance on [the decedent's] advice and companionship." After reviewing the record, this Court rendered judgment, awarding the adult children of the decedent $75,000 each. *Id.*, 2005-0501, p. 15, 934 So.2d at 857.

Mrs. Lege, Bridgette, and Tyler all testified that their family was very close. Indeed, the record shows that the whole Lege family would all go on vacation together yearly, including Rodney and Kristina, and would go camping often. The record also shows that the family spent a great deal of time together cooking and eating meals and spending time outdoors. Tyler specifically testified that Mr. Lege was the one in his family who took care of everyone and made everyone happy. Based on the testimony of the closeness of the Lege family, we determine that the highest reasonable wrongful damage award for Kristina and Rodney is $100,000. We amend the trial court's judgment accordingly, and affirm the judgment as amended.

***Assignment of Error No. 5 – Virile Share Assignment to Taylor-Seidenbach***

In its final assignment of error, Birla argues that the trial court erred in requiring Birla to provide proof of the released defendant Taylor-Seidenbach's fault in order to have its virile share of the damages assigned to it and in not assigning the virile share to Taylor-Seidenbach. Birla notes that the trial court denied Birla's exception of improper venue, finding that Taylor-Seidenbach is a solidary obligor with Birla. Birla contends the trial court's finding that Taylor-Seidenbach was a solidary obligor with Birla is a final judgment, giving it *res judicata* effect. Thus, according to Birla, it need not prove Taylor-Seidenbach's fault in order to receive a credit for Taylor-Seidenbach's virile share of the damages.

The Leges do not dispute that Taylor-Seidenbach is a solidary obligor with Birla and that the judgment on this point is final. They counter, however, that Birla still had a duty to prove Taylor-Seidenbach's fault in order to be given a credit for its virile share of the damages. We agree.

"The doctrine of *res judicata* precludes re-litigation of all causes of action arising out of the same transaction or occurrence that were the subject matter of a prior litigation between the same parties." *Contogouris v. Ocean Therapy Sols., LLC*, 2015-0472, p. 5 (La. App. 4 Cir. 1/27/16), 187 So.3d 18, 21.

In order to succeed on an exception of *res judicata*, the exceptor must show that five elements are present:

> 1) the judgment is valid; 2) the judgment is final; 3) the parties are the same; 4) the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation; and 5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject of the first litigation.

*Barrasso Usdin Kupperman Freeman & Darver, L.L.C. v. Burch*, 2014-1020, 14-1021, pp. 11-12 (La. App. 4 Cir. 3/18/15), 163 So.3d 201, 209 (citing *Chevron USA, Inc. v. State*, 2007-2469, p. 10 (La. 9/8/08), 993 So.2d 187, 194); *See also Louisiana Workers' Comp. Corp. v. Betz*, 2000-0603, p. 2 (La. App. 4 Cir. 4/18/01), 792 So.2d 763, 765.

"[A] valid judgment is one rendered by a court with jurisdiction over both the subject matter and the parties after proper notice is given." *Burguieres v. Pollingue*, 2002-1385, p. 8 (La. 2/25/03), 843 So.2d 1049, 1053 (internal citation omitted). In *Plaquemines Par. Gov't v. Getty Oil Co.*, 1995-2452, p. 6 (La. 5/21/96), 673 So.2d 1002, 1006 (citing *Preston Oil Co. v. Transcontinental Gas Pipe Line Corp.*, 594 So.2d 908, 913 (La. App. 1st Cir. 1991), the Louisiana Supreme Court held that "[a] judgment, whether it results from the assent of the parties [consent judgment] or is the result of a judicial determination after a trial on the merits, is and should be accorded sanctity under the law."

The trial court's judgment finding Birla a solidary obligor with Taylor-Seidenbachs is final and, thus, *res judicata*. There is no indication that the judgment is not valid, *i.e.* rendered by the trial court in the absence of proper jurisdiction. Additionally, there was no timely challenge to the judgment. The parties—Birla and the Leges—are the same and the transaction or occurrence—that of Birla and Taylor-Seidenbach's alleged fault in causing Mr. Lege's death from mesothelioma due to exposure to asbestos—is also the same. Nevertheless, though the issue of Birla being a solidary obligor with Taylor-Seidenbach has been established, we agree with the Leges and the trial court that Birla needed to prove Taylor-Seidenbach's fault in order to gain a credit for its virile share.

In *Berlier v. A.P. Green Indus., Inc.*, 2001-1530, p. 7 (La. 4/3/02), 815 So.2d 39, 44, the Louisiana Supreme Court provided an explanation of "obligations involving multiple persons recognized under Louisiana law, which are several, joint, and solidary obligations." *See also* La. C.C. art. 1786. Under La. C.C. art. 1794, "[a]n obligation is solidary for the obligors when each obligor is liable for the whole performance" and "[a] performance rendered by one of the solidary obligors relieves the others of liability toward the obligee." The Supreme Court explained that, "[a] solidary obligation may arise even though the words 'solidarity' or '*in solido*' are not used, as long as the parties' intent to be solidarily liable is clearly expressed." *Berlier*, 2001-1530, p. 8, 815 So.2d 39, 45.

On the other hand, "a joint obligation is one where different obligors owe together just one performance to one obligee, or where one obligor owes just one performance intended for the common benefit of different obligees." *Id.*, 2001-1530, p. 11, 815 So.2d at 46 (citing La. C.C. art. 1788). "[T]he classification of an obligation as several or joint depends upon the parties' intentions and understanding, as revealed by the language of their contract and the subject matter to which it refers." *Id.*, 2001-1530, p. 11, 815 So.2d at 46. (citing *Nabors v. Producers' Oil Co.*, 140 La. 985, 74 So. 527, 531 (1917); La. C.C. art. 1788, cmt. (d))

"Remission of debt by the obligee in favor of one obligor, or a transaction or compromise between the obligee and one obligor, benefits the other solidary obligors in the amount of the portion of that obligor." La. C.C. art. 1803. Further, La. C.C. art. 1804 provides:

> Among solidary obligors, each is liable for his virile portion. If the obligation arises from a contract or quasi-contract, virile portions are equal in the absence of agreement or judgment to the contrary. **If the**

**obligation arises from an offense or quasi-offense, a virile portion is proportionate to the fault of each obligor**." (Emphasis added).

La. C.C. art. 2324(A) provides that "[h]e who conspires with another person to commit an intentional or willful act is answerable, in solido, with that person, for the damage caused by such act." Thus, it is well-established that "joint tortfeasors were solidarily liable for the victim's damages." *Touchard v. Williams*, 617 So.2d 885, 889 (La. 1993). "The primary effect of solidary liability is that any tortfeasor may be compelled to pay the entire judgment." *Touchard*, 617 So.2d at 890. *See also* La. C.C. art. 1794.

In *Farbe v. Cas. Reciprocal Exch.*, 2000-0076, pp. 3-4 (La. 7/6/00, 765 So.2d 994, 996, the Louisiana Supreme Court explained the relationship between La. C.C. art. 1804 and La. C.C. art. 2324 and their application in a situation where, as here, a plaintiff settles with and releases an alleged tortfeasor before trial:

> The doctrine of contribution serves to mitigate the harsh effects of solidary liability by permitting a tortfeasor who has paid more than his share of a solidary obligation to seek reimbursement from the other tortfeasors for their respective shares of the judgment. La. C.C. art. 1804. The source of the right to claim contribution is subrogation to the plaintiff's rights against the remaining tortfeasors. Contribution rights are enforced by joining potential solidary co-obligors as third-party defendants. La. C.C. art. 1805.
>
> When a plaintiff settles with and releases one of several joint tortfeasors, he deprives the remaining obligors of the right to contribution against the released obligor. *Taylor v. United States Fidelity & Guar. Ins. Co.*, 630 So.2d 237, 239 (La. 1993); *Harvey v. Travelers Ins. Co.*, 163 So.2d 915, 921-22 (La. App. 3d Cir.1964). As comment (c) to article 1805 explains, "[a]n obligor who has been released by his obligee is no longer an obligor and therefore cannot be made a third party." In other words, once a plaintiff releases one solidary obligor, the plaintiff has no further rights against that obligor to which a remaining obligor can be subrogated. *Cunningham v. Hardware Mut. Cas. Co.*, 228 So.2d 700, 704 (La. App. 1 Cir. 1969).
>
> Accordingly, Civil Code articles 1803 and 1804 govern the effect of a plaintiff's settlement with one joint tortfeasor upon the rights of the remaining obligors.

The *Farbe* court explained that La. C.C. art. 1803 codified the rule that a plaintiff's settlement with one solidary obligor reduced the plaintiff's recovery against the remaining obligor by the amount of the released obligor's portion of the debt. *Id.*, 2000-0076, p. 5, 765 So.2d at 996 (citing *Taylor*, 630 So.2d at 239; *Harvey*, 163 So.2d at 921-22).

The introduction of the comparative fault system of tort liability changed the calculation of the settlement credit. Under the system of comparative fault, "[t]o the extent that a party defendant seeks to have the benefit of comparative fault of another as an affirmative defense...it bears the burden of proof by a preponderance of the evidence that the other party's fault was a cause-in-fact of the damage being complained about." *Dupree v. City of New Orleans*, 1999-3651, p. 18 (La. 8/31/00), 765 So.2d 1002, 1014, n.13 (citations omitted).

"Before comparative fault, when the debt was divided equally among joint tortfeasors, the settlement credit was calculated in proportion to the total number of tortfeasors found to be solidarily liable." *Farbe*, 2000-0076, p. 5, 765 So.2d at 997 (internal citations omitted). "Now, under article 1804 and comparative fault principles, judgments are reduced in proportion to the percentage of fault allocated to the released tortfeasor." *Id.* (citing *Taylor*, 630 So.2d at 239; *Buckbee v. Aweco, Inc.*, 614 So.2d 1233, 1239 (La. 1993); *Dill v. State of La., Dep't of Transp. and Dev.*, 545 So.2d 994, 997 (La. 1989)).

"Importantly, a nonsettling tortfeasor is entitled to a reduction in the judgment only if he proves at trial that the released party was at fault and therefore solidarily liable." *Id.* (citing S*teptoe v. Lallie Kemp Hosp.*, 1993-1359, p. 11-12

(La. 3/21/94), 634 So.2d 331, 337; *Taylor*, 630 So.2d at 239; *Raley v. Carter*, 412 So.2d 1045, 1046 (La. 1982)).

Birla argues that, because the issue of solidary liability was decided by the trial court's judgment on Birla's exception of improper venue, the issue of fault was likewise resolved. Thus, Birla argues it was under no obligation to prove Taylor-Seidenbach's fault in order to get a reduction for Taylor-Seidenbach's virile share of the liability. However, this ignores La. C.C. art. 1804 and *Farbe*, which both provide that, under comparative fault, the virile share of the liability is proportionate to the percentage of fault the trial court determined should be allocated to Taylor-Seidenbach, based on the evidence presented at trial.

We agree with the trial court that it was Birla's burden to prove the percentage of fault that should be allocated to Taylor-Seidenbach in order to obtain a reduction from the damage award for Taylor-Seidenbach's virile share. Birla failed to meet this burden, as it produced no evidence that Taylor-Seidenbach's asbestos-containing products were a substantial factor in causing Mr. Lege's mesothelioma. Indeed, Taylor-Seidenbach is hardly mentioned in the trial record at all.

Notably, Taylor-Seidenbach is not listed as a party to whom fault could be allocated on the jury interrogatories. "Where the evidence will not support a finding of comparative fault, the trial judge does not err in refusing to instruct the jury or submit a jury interrogatory on that issue." *Wiltz v. Bros. Petroleum, L.L.C.*, 2013-332, p. 26 (La. App. 5 Cir. 4/23/14), 140 So.3d 758, 776. Further, "it is reversible error for a trial judge to include a party on the jury interrogatory form where the record does not contain evidence of that party's legal fault." *Id.*

This Court finds that this assignment of error lacks merit.

38

## DECREE

For the foregoing reasons, we amend the trial court's judgment awarding Kristina and Rodney Lege $500,000 each for their wrongful death claim and reduce the award to $100,000 for Kristina and Rodney Lege each. We affirm the judgment as amended. In all other respects, the trial court's judgment is affirmed.

**AMENDED AND AFFIRMED AS AMENDED**